JERRE S. WILLIAMS, Circuit Judge:
 

 This is a bankruptcy preference case in which a bankruptcy trustee seeks to recover a transfer made via a letter of credit for the benefit of one of the debtor’s unsecured creditors on the eve of bankruptcy. The bankruptcy court and the district court found there to be no voidable preference. We reverse.
 

 I.
 
 Factual Background
 

 In March 1982, Blue Quail Energy, Inc., delivered a shipment of oil to debtor Compton Corporation. Payment of $585,443.85 for this shipment of oil was due on or about April 20, 1982. Compton failed to
 
 *589
 
 make timely payment. Compton induced Abilene National Bank (now MBank-Abi-lene) to issue an irrevocable standby letter of credit in Blue Quail’s favor on May 6, 1982. Under the terms of the letter of credit, payment of up to $585,443.85 was due Blue Quail if Compton failed to pay Blue Quail this amount by June 22, 1982. Compton paid MBank $1,463.61 to issue the letter of credit. MBank also received a promissory note payable on demand for $585,443.85. MBank did not need a security agreement to cover the letter of credit transaction because a prior 1980 security agreement between the bank and Compton had a future advances provision.
 
 [1]
 
 This 1980 security agreement had been perfected as to a variety of Compton’s assets through the filing of several financing statements. The most recent financing statement had been filed a year before, May 7, 1981. The letter of credit on its face noted that it was for an antecedent debt due Blue Quail.
 

 On May 7, 1982, the day after MBank issued the letter of credit in Blue Quail’s favor, several of Compton’s creditors filed an involuntary bankruptcy petition against Compton. On June 22, 1982, MBank paid Blue Quail $569,932.03 on the letter of credit after Compton failed to pay Blue Quail.
 

 In the ensuing bankruptcy proceeding, MBank’s aggregate secured claims against Compton, including the letter of credit payment to Blue Quail, were paid in full from the liquidation of Compton’s assets which served as the bank’s collateral. Walter Kellogg, bankruptcy trustee for Compton, did not contest the validity of MBank’s secured claim against Compton’s assets for the amount drawn under the letter of credit by Blue Quail. Instead, on June 14, 1983, trustee Kellogg filed a complaint in the bankruptcy court against Blue Quail asserting that Blue Quail had received a preferential transfer under 11 U.S.C. § 547 through the letter of credit transaction. The trustee sought to recover $585,443.85 from Blue Quail pursuant to 11 U.S.C. § 550.
 

 Blue Quail answered and filed a third party complaint against MBank. On June 16, 1986, Blue Quail filed a motion for summary judgment asserting that the trustee could not recover any preference from Blue Quail because Blue Quail had been paid from MBank’s funds under the letter of credit and therefore had not received any of Compton’s property. On August 27, 1986, the bankruptcy court granted Blue Quail’s motion, agreeing that the payment under the letter of credit did not constitute a transfer of debtor Compton’s property but rather was a transfer of the bank’s property. The bankruptcy court entered judgment on the motion on September 10, 1986. Trustee Kellogg appealed this decision to the district court. On December 11, 1986, the district court affirmed the bankruptcy court ruling, holding that the trustee did not establish two necessary elements of a voidable transfer under 11 U.S.C. § 547. The district court agreed with Blue Quail and the bankruptcy court that the trustee could not establish that the funds transferred to Blue Quail were ever property of Compton. Furthermore, the district court held that the transfer of the increased security interest to MBank was a transfer of the debtor’s property for the sole benefit of the bank and in no way benefitted Blue Quail. The district court therefore found no voidable preference as to Blue Quail. The trustee is appealing the decision to this Court.
 

 II.
 
 The Letter of Credit
 

 It is well established that a letter of credit and the proceeds therefrom are not property of the debtor’s estate under 11 U.S.C. § 541.
 
 In re W.L. Mead, Inc.,
 
 42 B.R. 57 (Bankr.N.D.Ohio, W.D.1984);
 
 In re Lesiure Dynamics, Inc.,
 
 33 B.R. 171 (Bankr.Minn.1983);
 
 In re North Shore & Central Illinois Freight Co.,
 
 30 B.R. 377 (Bankr.N.D.Ill., E.D.1983);
 
 In re M.J. Sales & Distributing Co.,
 
 25 B.R. 608 (Bankr.S.D.N.Y.1982). When the issuer honors a proper draft under a letter of credit, it does so from its own assets and not from the assets of its customer who caused the letter of credit to be issued.
 
 In re W.L. Mead; In re M.J. Sales.
 
 As a result, a bankruptcy trustee is not entitled to enjoin a post petition payment of funds under a letter of credit from the issuer to the beneficiary, because such a payment is not a transfer of debtor’s property (a threshold requirement under 11 U.S.C. § 547(b)). A case apparently holding otherwise,
 
 In re Twist Cap., Inc.,
 
 1 B.R. 284 (Bankr.Fla.1979), has been roundly criticized and oth
 
 *590
 
 erwise ignored by courts and commentators alike.
 

 Recognizing these characteristics of a letter of credit in a bankruptcy case is necessary in order to maintain the independence principle, the cornerstone of letter of credit law. Under the independence principle, an issuer’s obligation to the letter of credit’s beneficiary is independent from any obligation between the beneficiary and the issuer’s customer. All a beneficiary has to do to receive payment under a letter of credit is to show that it has performed all the duties required by the letter of credit. Any disputes between the beneficiary and the customer do not affect the issuer’s obligation to the beneficiary to pay under the letter of credit.
 

 Letters of credit are most commonly arranged by a party who benefits from the provision of goods or services. The party will request a bank to issue a letter of credit which names the provider of the goods or services as the beneficiary. Under a standby letter of credit, the bank becomes primarily liable to the beneficiary upon the default of the bank’s customer to pay for the goods or services. The bank charges a fee to issue a letter of credit and to undertake this liability. The shifting of liability to the bank rather than to the services or goods provider is the main purpose of the letter of credit. After all, the bank is in a much better position to assess the risk of its customer’s insolvency than is the service or goods provider. It should be noted, however, that it is the risk of the debtor’s insolvency and not the risk of a preference attack that a bank assumes under a letter of credit transaction. Overall, the independence principle is necessary to insure “the certainty of payments for services or goods rendered regardless of any intervening misfortune which may befall the other contracting party.”
 
 In re North Shore,
 
 30 B.R. at 378.
 

 The trustee in this case accepts this analysis and does not ask us to upset it. The trustee is not attempting to set aside the post petition payments by MBank to Blue Quail under the letter of credit as a preference; nor does the trustee claim the letter of credit itself constitutes debtor’s property. The trustee is instead challenging the earlier transfer in which Compton granted MBank an increased security interest in its assets to obtain the letter of credit for the benefit of Blue Quail. Collateral which has been pledged by a debtor as security for a letter of credit is property of the debtor’s estate.
 
 In re W.L. Mead,
 
 42 B.R. at 59. The trustee claims that the direct transfer to MBank of the increased security interest on May 6, 1982, also constituted an indirect transfer to Blue Quail which occurred one day prior to the filing of the involuntary bankruptcy petition and is voidable as a preference under 11 U.S.C. § 547. This assertion of a preferential transfer is evaluated in Parts III and IV of this opinion.
 

 It is important to note that the irrevocable standby letter of credit in the case at bar was not arranged in connection with Blue Quail’s initial decision to sell oil to Compton on credit. Compton arranged for the letter of credit after Blue Quail had shipped the oil and after Compton had defaulted in payment. The letter of credit in this case did not serve its usual function of backing up a contemporaneous credit decision,
 
 [2]
 
 but instead served as a back up payment guarantee on an extension of credit already in jeopardy. The letter of credit was issued to pay off an antecedent unsecured debt. This fact was clearly noted on the face of the letter of credit.
 
 [3]
 
 Blue Quail, the beneficiary of the letter of credit, did not give new value for the issuance of the letter of credit by MBank on May 6, 1982, or for the resulting increased security interest held by MBank. MBank, however, did give new value for the increased security interest it obtained in Compton’s collateral: the bank issued the letter of credit.
 

 When a debtor pledges its assets to secure a letter of credit, a transfer of debt- or’s property has occurred under the provisions of 11 U.S.C. § 547. By subjecting its assets to MBank’s reimbursement claim in the event MBank had to pay on the letter of credit, Compton made a transfer of its property. The broad definition of “transfer” under 11 U.S.C. § 101(50) is clearly designed to cover such a transfer. Overall, the letter of credit itself and the payments thereunder may not be property of debtor, but the collateral pledged as a security interest for the letter of credit is.
 

 
 *591
 
 Furthermore, in a secured letter of credit transaction, the transfer of debtor’s property takes place at the time the letter of credit is issued (when the security interest is granted) and received by the beneficiary, not at the time the issuer pays on the letter of credit.
 
 In re Briggs Transportation Co.,
 
 37 B.R. 76, 79 (Bankr.Minn.1984).
 
 In re M.J. Sales, supra
 
 (transfer of pledged collateral occurs not when bank forecloses on it, but when it is pledged.)
 

 The transfer to MBaiik of the increased security interest was a direct transfer which occurred on May 6, 1982, when the bank issued the letter of credit. Under 11 U.S.C. § 547(e)(2)(A), however, such a transfer is deemed to have taken place for purposes of 11 U.S.C. § 547 at the time such transfer “takes effect” between the transferor and transferee if such transfer is perfected within 10 days. The phrase “takes effect” is undefined in the Bankruptcy Code, but under Uniform Commercial Code Article 9 law, a transfer of a security interest “takes effect” when the security interest attaches. Because of the future advances clause in MBank’s 1980 security agreement with Compton, the attachment of the MBank’s security interest relates back to May 9, 1980, the date the security agreement went into effect. The bottom line is that the direct transfer of the increased security interest to MBank is artifically deemed to have occurred at least by May 7, 1981, the date MBank filed its final financing statement, for purposes of a preference attack against the bank.
 
 [4]
 
 This date is well before the 90 day window of 11 U.S.C. § 547(b)(4)(A). This would protect' the bank from a preference attack by the trustee even if the bank had not given new value at the time it received the increased security interest. MBank is therefore protected from a preference attack by the trustee for the increased security interest transfer under either of ttoo theories: under 11 U.S.C. § 547(c)(1) because it gave new value and under the operation of the relation back provision of 11 U.S.C. § 547(e)(2)(A). The bank is also protected from any claims of reimbursement by Blue Quail because the bank received no voidable preference.
 

 The relation back provision of 11 U.S.C. § 547(e)(2)(A), however, applies only to the direct transfer of the increased security interest to MBank. The indirect transfer to Blue Quail that allegedly resulted from the direct transfer to MBank occurred on May 6,1982, the date of issuance of the letter of credit. The relation back principle of 11 U.S.C. § 547(e)(2)(A) does not apply to this indirect transfer to Blue Quail. Blue Quail was not a party to the security agreement between MBank and Compton. So it will not be able to utilize the relation back provision if it is deemed to have received an indirect transfer resulting from the direct transfer of the increased security interest to MBank. Blue Quail, therefore, cannot assert either of the two defenses to a preference attack which MBank can claim. Blue Quail did not give new value under § 547(c)(1), and it received a transfer within 90 days of the filing of Compton’s bankruptcy petition.
 
 [5]
 

 III.
 
 Direct/Indirect Transfer Doctrine
 

 The federal courts have long recognized that “[t]o constitute a preference, it is not necessary that the transfer be made directly to the creditor.”
 
 National Bank of Newport v. National Herkimer County Bank,
 
 225 U.S. 178, 184, 32 S.Ct. 663, 635¢G, 56 L.Ed. 1042¢G (1912). “If the bankrupt has made a transfer of his property, the
 
 effect
 
 of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it.”
 
 Id.
 
 (Emphasis added). To combat such circuity, the courts have broken down certain transfers into two transfers, one direct and one indirect. The direct transfer to the third party may be valid and not subject to a preference attack. The indirect transfer, arising from the same action by the debtor, however, may constitute a voidable preference as to the creditor who indirectly benefitted from the direct transfer to the third party.
 

 
 *592
 
 This is the situation presented in the case before us. The term “transfer” as used in the various bankruptcy statutes through the years has always been broad enough to cover such indirect transfers and to catch various circuitous arrangements.
 
 Katz v. First National Bank of Glen Head,
 
 568 F.2d 964, 969 n. 4, (2nd Cir.),
 
 cert. denied,
 
 434 U.S. 1069, 98 S.Ct. 1250¢G, 55 L.Ed.2d 771¢G (1978). The new Bankruptcy Code implicitly adopts this doctrine through its broad definition of "transfer.”
 
 [6]
 
 Exam-'; ining the case law that has developed since the
 
 National Bank of Newport
 
 case yields an understanding of what types of transfers the direct/indirect doctrine is meant to cover.
 

 In
 
 Palmer v. Radio Corporation of America,
 
 453 F.2d 1133 (5th Cir.1971), a third party purchased from the debtor a television station for $40,000 cash and the assumption of certain liabilities of the debt- or, including unsecured claims by creditor RCA. This Court found the direct transfer from the debtor to the third party purchaser constituted an indirect preferential transfer to creditor RCA. We found that the assumption by the third party purchaser of the debt owed by the debtor to RCA and the subsequent payments made thereunder constituted a voidable transfer as to RCA. The court noted that such indirect transfers as this had long been held to constitute voidable preferences under bankruptcy laws. 453 F.2d at 1136.
 

 Although the
 
 Palmer
 
 court did not elaborate its reasoning behind this holding, such reasoning is self evident. A secured creditor was essentially substituted for an unsecured creditor through the transfer of the television station to the third party purchaser and the assumption of the unsecured debt by the purchaser. The third party purchaser was in effect secured because it had the television station. Creditor RCA would receive payments directly from the solvent third party without having to worry about its original debtor’s financial condition. The original debtor’s other unsecured creditors were harmed because a valuable asset of the debtor, the television station, was removed from the debtor's estate. The end result of the
 
 Palmer
 
 case was that the third party’s payments on the RCA debt were to be made to the debtor’s estate instead of to RCA. RCA would then recover the same percentage of its unsecured claim from the estate as the other unsecured creditors.
 

 In
 
 In re Conrad Corp.,
 
 806 F.2d 610 (5th Cir.1986), we found a voidable indirect transfer on facts similar to those of
 
 Palmer v. Radio Corporation of America.
 
 In the
 
 Conrad
 
 case, the debtors bought several restaurants from the Burtons in exchange for an unsecured promissory note. A third party in turn purchased the restaurants from the debtors and assumed the payments to the Burtons on the promissory note. Relying on the analysis of the
 
 Palmer
 
 case, we held that the transfer of the restaurants by the debtors in exchange for a simultaneous assumption of the Burton debt by the third party benefitted the Bur-tons and constituted a voidable indirect transfer as to the Burtons.
 

 We observed that as a result of executing the assumption of debt agreement, the debtors transfered to the Burtons the debtors’ right to receive from the third party so much of the sales price for the restaurants as was needed to reimburse the Burtons on their unsecured note. Once again a secured creditor, in effect, was substituted for an unsecured creditor by the transfer, and a depletion of the debtor’s estate occurred. We held that the trustee of the debtor could recover from the Burtons the payments made by the third party to the Burtons and that the Burtons would recover only their proportionate share of the value of the unencumbered assets of the debtor along with the other unsecured creditors.
 

 There are a number of federal cases in the other circuits supporting the holdings and reasoning in our direct/indirect doctrine cases. In
 
 Aulick v. Largent,
 
 295 F.2d 41 (4th Cir.1961), a third party endorsed the debtor’s antecedent obligation to one of the debtor’s unsecured creditors in exchange for the transfer of some stock within the preference time period. The creditor eventually received payment from the third party who in turn retained the pledged stock. The Fourth Circuit held
 
 *593
 
 that while the direct transfer of the stock to the third party to secure the contingent liability of the endorsement was not voidable because it was a transfer for consideration presently furnished, the indirect transfer to the unsecured creditor via the third party endorser was a voidable preference. The creditor in
 
 Aulick
 
 made the same argument that Blue Quail makes in the case at bar. The creditor claimed that the payment to it by the third party endorser came from the endorser’s personal funds and thus the payment did not deplete the debt- or’s estate. Therefore one of the essential elements of a voidable preference was lacking.
 

 The court rejected this argument relying on
 
 National Bank of Newport.
 
 The
 
 Aulick
 
 court found there to be two transfers arising from the pledge of stock to the third party, one direct and one indirect, and then collapsed them, in effect, into a single one for a preference attack against the indirect transferee creditor. The court noted that if the debtor had delivered the shares of stock directly to the unsecured creditor as security for the antecedent debt, the creditor would have clearly received a voidable preference. The court held that such a result could not be avoided by indirect arrangement.
 
 [7]
 
 “[Preferences obtained by indirect or circuitous arrangements are to be struck down just as quickly as those obtained by direct arrangements.” 295 F.2d at 52.
 

 In
 
 Virginia National Bank v. Woodson,
 
 329 F.2d 836 (4th Cir.1964), the debtor had several overdrawn accounts with his bank.
 
 [8]
 
 The debtor talked his sister into paying off $8,000 of the overdrafts in exchange for an $8,000 promissory note and an assignment of some collateral as security. The debt- or’s sister made the $8,000 payment directly to the bank. The $8,000 technically was never part of the debtor’s estate. The court, however, held that the payment of the $8,000 by the sister to the bank was a preference as to the bank to the extent of the value of the collateral held by the sister. The court noted that the measure of the value of a voidable preference is dimun-ition of the debtor’s estate and not the value of the transfer to the creditor.
 

 In the
 
 Woodson
 
 case the sister was secured only to the extent the pledged collateral had value; the remainder of her loan to her brother was unsecured. Swapping one unsecured creditor for another unsecured creditor does not create any kind of preference. The court held that a preference in such a transaction arises only when a secured creditor is swapped for an unsecured creditor. Only then is the pool of assets available for distribution to the general unsecured creditors depleted because the secured creditor has priorty over the unsecured creditors. Furthermore, the court held that the bank and not the sister had received the voidable preference and had to pay back to the trustee an amount equal to the value of the collateral.
 

 A slightly different indirect transfer was involved in
 
 In re Mercon Industries, Inc.,
 
 37 B.R. 549 (Bank.E.D.Penn.1984). In that case a debtor paid off a non-insider unsecured creditor within one year of the filing of the bankruptcy petition on a debt guaranteed by insiders of the debtor. The payment to the creditor had the effect of releasing the insider guarantors from contingent liability on the debt, thereby benefit-ting the insiders. The court held that releasing an insider guarantor from contingent liability is a beneficial transfer to the guarantor for purposes of 11 U.S.C. § 547.
 

 The court in
 
 Mercon
 
 viewed the payment to the non-insider creditor as effecting two transfers under the Bankruptcy Code because of the secondary liability of the guarantors on the debt. The court held that while the direct transfer from the debtor to the non-insider creditor in satisfaction of the primary debt may not be a voidable preference (if it was made over 90 days of filing), the court found that the indirect transfer to the insider guarantors extinguishing their contingent liability (and their contingent unsecured claim for reimbursement) was a separate voidable transfer under 11 U.S.C. § 547. Such an indirect
 
 *594
 
 transfer is voidable if it occurred within one year of filing pursuant to § 547(b)(4)(B). Furthermore, the court held that because the Bankruptcy Code “dictates that there are two transfers rather than one, liability of the guarantors under § 547(b) need not be predicated on a finding of an avoidable transfer to [the non-insider creditor], since a finding of liability on one transfer is independent of the other, rather than derivative.” 37 B.R. at 552. The court held that the insider guarantors, and not the non-insider creditor, were ultimately liable for this preference.
 
 [9]
 

 IV.
 
 The Direct/Indirect Doctrine in the Context of a Letter of Credit Transaction
 

 The case at bar differs from the cases discussed in Part III
 
 supra
 
 only by the presence of the letter of credit as the mechanism for paying off the unsecured creditor. Blue Quail’s attempt to otherwise distinguish the case from the direct/indirect transfer cases does not withstand scrutiny.
 

 In the letter of credit cases discussed in Part II
 
 supra,
 
 the letters of credit were issued contemporaneously with the initial extension of credit by the beneficiaries of the letters. In those cases the letters of credit effectively served as security devices for the benefit of the creditor beneficiaries and took the place of formal security interests. The courts in those cases properly found there had been no voidable transfers, direct or indirect, in the letter of credit transactions involved. New value was given contemporaneously with the issuance of the letters of credit in the form of the extensions of credit by the beneficiaries of the letters. As a result, the 11 U.S.C. § 547(c)(1) preference exception was applicable.
 

 The case at bar differs from these other letter of credit cases by one very important fact: the letter of credit in this case was issued to secure an antecedent unsecured debt due the beneficiary of the letter of credit. The unsecured creditor beneficiary gave no new value upon the issuance of the letter of credit. When the issuer paid off the letter of credit and foreclosed on the collateral securing the letter of credit, a preferential transfer had occurred. An unsecured creditor was paid in full and a secured creditor was substituted in its place.
 

 The district court upheld the bankruptcy court in maintaining the validity of the letter of credit issued to cover the antecedent debt. The district court held that MBank, the issuer of the letter of credit, could pay off the letter of credit and foreclose on the collateral securing it. We are in full agreement. But we also look to the impact of the transaction as it affects the situation of Blue Quail in the bankrupt estate. We hold that the bankruptcy trustee can recover from Blue Quail, the beneficiary of the letter of credit, because Blue Quail received an indirect preference. This result preserves the sanctity of letter of credit and carries out the purposes of the Bankruptcy Code by avoiding a preferential transfer. MBank, the issuer of the letter of credit, being just the intermediary through which the preferential transfer was accomplished, completely falls out of the picture and is not involved in this particular legal proceeding.
 

 MBank did not receive any preferential transfer — it gave new value for the security interest. Furthermore, because the direct and indirect transfers are separate and independent, the trustee does not even need to challenge the direct transfer of the increased security interest to MBank, or seek any relief at all from MBank, in order to attack the indirect transfer and recover under 11 U.S.C. § 550 from the indirect transferee Blue Quail.
 

 We hold that a creditor cannot secure payment of an unsecured antecedent debt through a letter of credit transaction when it could not do so through any other type of transaction. The purpose of the letter of credit transaction in this case was to secure payment of an unsecured antecedent debt for the benefit of an unsecured creditor. This is the only proper way to look at such letters of credit in the bankruptcy context. The promised transfer of pledged collateral induced the bank to issue the letter of credit in favor of the creditor. The increased security interest held by the bank clearly benefitted the creditor because the bank would not have issued the letter of credit without this security. A
 
 *595
 
 secured creditor was substituted for an unsecured creditor to the detriment of the other unsecured creditors.
 

 We also hold, therefore, that the trustee can recover under 11 U.S.C. § 550(a)(1) the value of the transferred property from “the entity for whose benefit such transfer was made.” In the case at bar, this entity was the creditor beneficiary, not the issuer, of the letter of credit even though the issuer received the direct transfer from the debtor. The entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer.
 
 [10]
 

 The fact that there was a prior security agreement between the issuing bank and the debtor containing the future advances clause does not alter this conclusion. As we pointed out in Part II
 
 supra,
 
 this prior security agreement gave MBank an additional shield from preferential attack because of the relation back mechanism of 11 U.S.C. § 547(e)(2)(A). 11 U.S.C. § 547(e)(2)(A), however, does not avail Blue Quail to shield it from a preferential attack for the indirect transfer. The indirect transfer to Blue Quail occurred on May 6, 1982, when the letter of credit was issued and the increased security interest was pledged. This was the day before the involuntary bankruptcy petition was filed. For purposes of 11 U.S.C. § 547, a transfer of Compton’s property for the benefit of Blue Quail did occur within 90 days of the bankruptcy filing. The bankruptcy and district courts erred in failing to analyze properly the transfer of debtor’s property that occurred when Compton pledged its assets to obtain the letter of credit. This transfer consisted of two aspects: the direct transfer to MBank which is not a voidable preference for various reasons and the indirect transfer to Blue Quail which is a voidable preference.
 

 All of the requirements of 11 U.S.C. § 547(b) have been satisfied in the trustee’s preferential attack against Blue Quail. There was (1) a transfer of Compton’s property for the benefit of Blue Quail (2) for an antecedent debt owed by Compton (3) made while Compton was insolvent
 
 [11]
 
 (4) within 90 days before the date of the filing of the petition (5) that enabled Blue Quail to receive more than it would receive under a Chapter 7 liquidation.
 
 [12]
 
 The net effect of the indirect transfer to Blue Quail was to remove $585,443.85 from the pool of assets available to Compton’s unsecured creditors and substitute in its place a secured claim for the same amount.
 

 The precise holding in this case needs to be emphasized. We do not hold that payment under a letter of credit, or even a letter of credit itself, constitute preferential transfers under 11 U.S.C. § 547(b) or property of a debtor under 11 U.S.C. § 541. The holding of this case fully allows the letter of credit to function. We preserve its sanctity and the underlying independence doctrine. We do not, however, allow an unsecured creditor to avoid a preference attack by utilizing a letter of credit to secure payment of an antecedent debt. Otherwise the unsecured creditor would receive an indirect preferential transfer from the granting of the security for the letter of credit to the extent of the value of that security. Our holding does not affect the strength of or the proper use of letters of credit. When a letter of credit is issued contemporaneously with a new extension of credit, the creditor beneficiary will not be subject to a preferential attack under the direct/indirect doctrine elaborated in this case because the creditor will have given new value in exchange for the indirect benefit of the secured letter of credit. Only when a creditor receives a secured letter of credit to cover an unsecured antecedent debt will it be subject to a preferential attack under 11 U.S.C. § 547(b).
 

 
 *596
 
 V.
 
 Liability of MBank for the Preferential Transfer
 

 Blue Quail has no valid claim against MBank for reimbursement for any amounts Blue Quail has to pay the trustee under the trustee’s preference claim, just as the trustee has no preference challenge against MBank. Blue Quail received the preferential transfer, not MBank. MBank gave new value in exchange for the increased security interest in its favor. Thus, it is insulated from any assertion of a voidable preference. The bank in no way assumed the risk of a preference attack by issuing the letter of credit. For these reasons, we affirm the district court’s dismissal of Blue Quail’s request to proceed against MBank for reimbursement.
 
 [13]
 

 In addition, the trustee may not set aside the $1,463.61 fee Compton paid MBank to issue the letter of credit. This payment is not a preferential transfer. MBank has fully performed its duties under the terms of the letter of credit and has earned this fee. The services MBank rendered in issuing and executing the letter of credit constitute new value under the 11 U.S.C. § 547(c)(1) preference exception.
 

 VI.
 
 Conclusion
 

 Blue Quail Energy received an indirect preferential transfer from Compton Corporation on May 6, 1982, one day prior to the filing of Compton’s bankruptcy petition. We reverse the district court and render judgment in favor of Trustee Kellogg against Blue Quail Energy, Inc. in the amount of $585,443.85 plus interest to be fixed by the district court pursuant to 11 U.S.C. §§ 547, 550. The district court’s dismissal of Blue Quail’s claim against MBank for reimbursement is affirmed.
 

 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.
 

 [1]
 

 . A future advances clause in a security agreement subjects the specified collateral to any future loan made by the creditor in addition to the current loans.
 

 [2]
 

 . As was the case in
 
 In re W.L. Mead, Inc., In re Leisure Dynamics, In re North Shore & Central Illinois Freight Co.,
 
 and
 
 In re M.J. Sales,
 
 all
 
 supra.
 

 [3]
 

 . The letter of credit was dated May 6, 1982, and noted that it covered delivery of Oklahoma Sweet crude oil during March 1982.
 

 [4]
 

 . Tex.Bus. & Com.Code Ann. § 9.312(g) specifies that for purposes of priority among competing secured parties, the security interest for a future advance has the same priority as the security interest for the first advance. Conflicting security interests rank according to priority in time of filing or perfection. Tex.Bus. & Com. Code Ann. § 9.312(e)(1).
 

 [5]
 

 . Nor does Blue Quail have the protection of the 11 U.S.C. § 547(c)(2) "ordinary course of business’ preference exception. Getting a standby letter of credit issued to cover a debt several weeks past due does not constitute ordinary course of business.
 

 [6]
 

 .
 
 "Transfer” means every mode, direct or
 
 indirect,
 
 absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor’s equity of redemption. 11 U.S.C. § 101(50) (emphasis added).
 
 See also
 
 the Notes of the Committee on the Judiciary under 11 U.S.C. 101 ("The definition of transfer is as broad as possible.”)
 

 [7]
 

 . Apparently the bottom line in the
 
 Aulick
 
 case was that the creditor and not the third party endorser was ultimately liable for the preferential transfer. This is the way the preference provisions are supposed to work; it was the creditor, after all, and not the endorser who was preferred. It should also be noted that there would have been no preference attack against the creditor had not the endorser received the assignment of stock from the debtor to secure its contingent liability on the endorsement. It is the substitution of a secured creditor for a general unsecured creditor that constitutes the voidable transfer as to the unsecured creditor. This is a common theme underlying the direct/indirect cases and applies with equal force to the case at bar.
 

 [8]
 

 . Unsecured antecedent debts.
 

 [9]
 

 .
 
 See also In re Deprizio Construction Co.,
 
 58 B.R. 478 (N.D.Ill.E.D.1986) (case with similar facts and a similar holding). This case also described the bankruptcy courts’ equitable powers under 11 U.S.C. § 550 to preclude a trustee from recovering from innocent creditors who were the initial direct transferees of a voidable indirect preference.
 

 [10]
 

 .We have found only one prior case that has fully addressed the application of the direct/indirect doctrine in the context of a letter of credit transaction.
 
 In re Air Conditioning, Inc. of Stuart,
 
 55 B.R. 157 (Bankr.S.D.Fla.1985),
 
 affirmed in part, reversed in part
 
 72 B.R. 657 (S.D.Fla.1987) (currently on appeal to the Eleventh Circuit). In a carefully and thoroughly reasoned opinion, the court reached the same conclusion we reach in this case.
 

 [11]
 

 . There is a presumption that a debtor is insolvent at least 90 days prior to its bankruptcy filing. 11 U.S.C. § 547(f).
 

 [12]
 

 . There was undisputed evidence below that the other unsecured creditors of Compton would receive less than fifty cents on the dollar for their unsecured claims.
 

 [13]
 

 . The liability of MBank to Blue Quail in the event of this Court’s finding a preferential transfer to Blue Quail is interrelated with the Trustee’s preference challenge against Blue Quail, The briefs of Blue Quail and Trustee Kellogg both addressed this issue.