# United States Bankruptcy Appellate Panel
# For the Eighth Circuit

No. 99-6068NE

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Papio Keno Club, Inc. | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Papio Keno Club, Inc. | * | Appeal from the United |
| | * | States Bankruptcy Court |
| Plaintiff-Appellee | * | for the District of Nebraska |
| | * | |
| v. | * | |
| | * | |
| City of Papillion | * | |
| | * | |
| Defendant-Appellant. | * | |

Submitted: February 17, 2000
Filed: April 18, 2000

Before WILLIAM A. HILL, SCHERMER, and DREHER, Bankruptcy Judges.

DREHER, Bankruptcy Judge

      This is an appeal by the City of Papillion from a final judgment entered by the bankruptcy court,[1] which ordered the City to turn over $182,597 to the Debtor, Papio Keno

---

      [1]The Honorable Timothy J. Mahoney, Chief Judge, United States Bankruptcy Court for the District of Nebraska.

Club, Inc. We affirm, except to the extent necessary to correct a mathematical error in calculating the amount of the judgment.

## I. BACKGROUND

Debtor Papio Keno Club ("Debtor") and the City of Papillion ("City") entered into a Lottery Operator Agreement on September 15, 1992 (the "agreement"). Under the agreement the Debtor was to operate a keno-type lottery in the City for a term of five years. The agreement contained terms relating to all aspects of the relationship between the Debtor and the City, including the rights and duties of each party, the location of the lottery, the sale of food and beverages, the type of equipment to be used, the amount of insurance to be maintained, and the terms of default. To secure the Debtor's performance of all of its obligations under the agreement, Paragraph 12 required the Debtor to provide a performance and payment bond in the amount of $250,000. In lieu of the bond, the Debtor was given the choice to deliver an irrevocable letter of credit for the same amount, which is the option the Debtor chose. The agreement also contained a liquidated damages provision that allowed the City to draw on the letter of credit upon a material breach by the Debtor. For the first breach, the City could draw $2,500 for each day that the breach continued, and for the second and all subsequent breaches, the City could draw $5,000 for each day that the breach continued.

Paragraph 5 of the agreement provided for the distribution of the proceeds of the lottery. The Debtor was entitled to 10% of the gross proceeds from which to pay all expenses. No less than 65% of gross proceeds were to be paid out as winnings. The remaining portion of the gross proceeds, including all unclaimed winnings, would go to the City. Paragraph 14.2 of the agreement specified that the responsibility for paying the prizes fell solely on the Debtor. As security for this obligation, the agreement required the Debtor to deposit a cash reserve with the City totaling two times the maximum possible prize in a

2

regular game. The agreement also gave the Debtor the option of offering a progressive game. In such event, the Debtor was to maintain a cash reserve in an amount not less than the sum of the maximum prize possible in the regular game plus the amount available to be won in the progressive game. The Debtor did not deliver such cash reserve to the City at the commencement of the lottery operation.[2] Paragraph 14.2(g) of the agreement specifically provided that the cash reserve would be returned to the Debtor after all prizes had been paid at the termination of the agreement.

In August of 1993, the parties amended the agreement to more clearly set forth the rights and duties with respect to a progressive game (the "amendment"). As part of the amendment, the Debtor was authorized to pay 1% of the gross proceeds toward the progressive jackpot, which came from the City's share of the gross proceeds. Once the jackpot reached $200,000, the Debtor was to resume paying the 1% to the City. The parties entered into this amendment primarily to conform the agreement to applicable statutes and regulations. The amendment made no explicit changes to the obligations undertaken in the original agreement.

In May of 1993, which was prior to the amendment, the Debtor began depositing funds in a money market account with a local bank. The amount deposited each month approximately equaled 1% of the gross proceeds for that month, although the deposits were not made consistently. The Debtor deposited $25,488 before the amendment. The bankruptcy court found that this amount came from the Debtor's share of the gross proceeds because the Debtor was not yet authorized by the amendment to fund the reserve with the City's share of the proceeds. The Debtor deposited $107,012 after the amendment. The

---

[2]The City states in its brief that the Debtor may have initially provided a letter of credit to satisfy this obligation, but any such letter of credit had long since been terminated by the time of the events giving rise to this appeal.

court determined that this amount had come from the City's share of the gross proceeds pursuant to the amendment. In January of 1995, the Debtor withdrew the funds from the money market account, then totaling $134,900 with accrued interest, and purchased a Certificate of Deposit in that amount. No additional deposits were made into the CD, but it continued to accrue interest, ultimately reaching a value of $169,330. The bankruptcy court determined that 19% of the total interest earned could be attributed to the funds deposited prior to the amendment because those funds totaled approximately 19% of the total deposits.

In August of 1997, the relationship between the Debtor and the City began to deteriorate. The City claimed that the funds in the CD represented the cash reserve required under Paragraph 14.2 of the agreement and demanded that the Debtor transfer the CD to the City's name. The Debtor complied. The City then determined that the amount in the CD was not sufficient under the terms of Paragraph 14.2 because the maximum prize in the regular game was $50,000 and the progressive jackpot was $200,000. Thus, the agreement required a reserve of $250,000. The City made a demand under the letter of credit for $80,670 to make up the difference. The City also made a demand for an additional $40,509 for unclaimed winnings that the Debtor had not paid to the City.

The bank that had issued the letter of credit made the payment pursuant to the City's demand and, in turn, demanded reimbursement from the Debtor. When the Debtor was unable to obtain enough funds for reimbursement, the bank gave notice that it was terminating the letter of credit. The City then reviewed the agreement for additional defaults by the Debtor. At that point, because it had not replenished the letter of credit, the Debtor was in default under Paragraph 12, which required a letter of credit in the amount of $250,000. The City also discovered that the Debtor was carrying only $4 million in liability insurance even though the agreement required $5 million in coverage, that the Debtor had

not timely filed for a renewal of its license under the terms of the agreement, and that the Debtor was not conducting the background checks on its employees as the agreement required. The City invoked the liquidated damages provision and claimed damages in excess of $4.3 million. The City then drew down the remaining portion of the letter of credit on September 17, 1997. The City terminated the agreement on September 30, 1997, due to the Debtor's failure to cure the defaults. Soon thereafter, on October 3, the Debtor filed its bankruptcy petition under Chapter 11.

The Debtor commenced an adversary proceeding against the City consisting of seven counts. In Counts I - V, the Debtor alleged that the transfer of the CD to the City was a fraudulent transfer or a preferential transfer, that the draw on the letter of credit for the liquidated damages was a fraudulent transfer, and that the other funds obtained from the letter of credit should be turned over as property of the estate. In Count VII, the Debtor sought an accounting for all of the funds obtained by the City. The bankruptcy court found in favor of the City on each of these counts, and the Debtor did not appeal.

Count VI of the complaint was a breach of contract action in which the Debtor alleged that the City wrongfully terminated the agreement. The bankruptcy court found that the City did not breach the agreement by terminating it. However, the court went on to find that a breach did occur when the City failed to turn over funds to the Debtor that it was required to return pursuant to Paragraph 14.2(g). In this respect, the court ordered the City to turn over the funds held in the CD, but it excluded from the turnover order those funds that could be attributed to the City's share of the gross proceeds, i.e., the $107,012 contributed after the amendment plus interest. The judgment also required the turnover of the $80,670 drawn from the letter of credit to fund the cash reserve. The court further determined that the liquidated damages provision of the agreement was unenforceable and ordered the City to turn over the funds drawn from the letter of credit to the extent they were attributable to that

5

provision. However, the court ruled that the City could retain $6,000 as compensation for an audit expense and $51,481, which was the City's share of the September proceeds.

In sum, at the commencement of the bankruptcy case, the City held $419,330 ($250,000 drawn from the letter of credit plus $169,330 in the CD). The court found that the City could retain $226,733, and ordered the City to turn over $182,597 to the Debtor. However, the court incorrectly calculated that the interest earned on the CD was $26,829. In fact, the interest earned was $36,829. Adjusting for the actual amount of interest earned and applying the court's findings and conclusions, the City would retain $234,833 and would turn over $184,497. The following charts summarize the transactions involving the letter of credit and the CD and provide the court's disposition of each portion of the funds held by the City:

Letter of Credit

| Date | Amount | Reason for Draw | Disposition |
|------|--------|-----------------|-------------|
| 8/97 | $80,670 | To bring cash reserve to $250,000 | Return to Debtor |
| 8/97 | $40,509 | Unclaimed wins not paid to City | City retains |
| 9/97 | $128,821 | Liquidated damages | City retains $57,481<br>Return $71,340 to Debtor |

Certificate of Deposit

| Date | Amount | Source | Disposition |
|------|--------|--------|-------------|
| 5/93-8/93 | $25,488 | Debtor's share of gross proceeds | Return to Debtor |
| | $6,998 | Interest on $25,488 | Return to Debtor |
| 8/93-1/95 | $107,012 | City's share of gross proceeds | City retains |
| | $29,831 | Interest on $107,012 | City retains |

6

II. DISCUSSION

A. Issues Not Raised by Pleadings

As its first issue on appeal, the City argues that the bankruptcy court erred in making any decision with respect to the City's obligation to return funds to the Debtor under Paragraph 14.2(g) of the agreement. This is the provision that requires the City to return the cash reserve to the Debtor after the agreement is terminated. The City argues that this issue was not raised by the complaint or the joint pretrial statement and, therefore, was beyond the court's jurisdiction.

The City is correct that the Debtor's complaint does not specifically allege a breach of Paragraph 14.2(g) of the agreement. However, Count VI of the complaint contains a broad statement that the Debtor was damaged by the City's actions in connection with the termination of the agreement in the amount of $445,000 and seeks judgment in that amount. Under the liberal standards for pleading, see Fed. R. Bankr. P. 7008, this statement was sufficient to put the City on notice that the Debtor claimed a breach of the agreement in all respects, not just by the termination itself, and that it may be required to return some or all of the funds. Additionally, Count VII sought an accounting of all of the funds that the City had received. While the court denied this equitable remedy because there was an adequate remedy at law, Count VII also should have put the City on notice that the Debtor was seeking the return of some or all of the funds.

Further, the joint pre-trial statement entered into by both parties contains the following issues: (1) "whether [the City] is in possession of funds properly belonging to the [Debtor] which constitute property of [the Debtor's] Chapter 11 estate"; and (2) "whether [the Debtor] has been damaged by [the City's] actions in terminating [the Debtor's] rights under the Agreement." The Debtor also continued to request an

7

accounting. As with the complaint, the issues raised in the pretrial statement are sufficiently broad to allow the court to find that the City improperly refused to return the cash reserve to the Debtor upon the termination of the agreement. Accordingly, the court did not err by ruling on this issue.

Even if it could be argued that the complaint and the pretrial statement did not make it clear that a breach of Paragraph 14.2(g) was at issue, it was certainly tried by consent. In his opening statement, Debtor's counsel argued that the money in the reserve belonged to the Debtor and that the Debtor was entitled to its return under Paragraph 14.2(g). Harry Rudolph, the Debtor's president testified that his understanding of Paragraph 14.2(g) was that the money in the reserve belonged to the Debtor and was to be returned to the Debtor upon termination of the agreement. On cross examination, the Debtor's counsel questioned both the City's Administrator and Finance Director about whether the money in the reserve had been returned to the Debtor. Finally, in its closing argument, the Debtor's counsel once again argued that the City was contractually obligated to return the reserve funds under Paragraph 14.2(g). Each of these instances was sufficient to notify the City that the issue of whether Paragraph 14.2(g) had been breached was being tried. Because the City did not object to this evidence as it came in, it is deemed to have consented to trial of this issue. See Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997) (citing Nielson v. Armstrong Rubber Co., 570 F.2d 272, 275 (8th Cir. 1978)); see also United States v. National Homes Construction Corp, 581 F.2d 157, 162 (8th Cir. 1978) (failure to object to evidence contrary to pretrial order foreclosed objection on appeal).

### B. Proceeds of the Letter of Credit

For its second issue, the City argues that the bankruptcy court erred in ordering it to turn over any funds to the Debtor that were proceeds of the letter of credit.

An irrevocable letter of credit creates three separate commitments: (1) the contract between the debtor and the bank binding the bank to issue the letter of credit in exchange for a right of reimbursement; (2) the underlying contract between the debtor and the beneficiary of the letter of credit; and (3) the obligation of the bank to honor drafts of the beneficiary so long as all documentation is in order.  2 Barkley Clark & Barbara Clark, The Law of Bank Deposits, Collections and Credit Cards ¶ 14.02[1], at 14-9 (rev. ed. 1999); see also Bank of Newport v. First Nat'l Bank & Trust Co., 687 F.2d 1257, 1261 (8th Cir. 1982).  Thus, the letter of credit creates an independent obligation of the issuing bank to pay the beneficiary upon timely presentment of the documents specified in the letter.  Global Network Technologies, Inc. v. Regional Airport Authority, 122 F.3d 661, 664 n.2 (8th Cir. 1997).  Such obligation is independent of the contract between the debtor and the beneficiary.  Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.), 831 F.2d 586, 590 (5th Cir. 1988).  It is irrelevant to the bank's obligation that the beneficiary did not perform its end of the bargain in the underlying contract.  Security Servs., Inc. v. Nat'l Union Fire Ins. Co. (In re Security Servs., Inc.), 132 B.R. 411, 414 (Bankr. W.D. Mo. 1991).

The City argues that, pursuant to this "independence principle," any funds received from the letter of credit should not be returned to the Debtor because the Debtor had no property interest in the letter of credit or its proceeds.  The City is correct up to a point.  It is well settled that a letter of credit and the proceeds therefrom are not property of the debtor's bankruptcy estate.  Compton, 831 F.2d at 589.  When the issuer honors a proper draft under a letter of credit, it does so from its own assets and not from the assets of its customer which caused the letter of credit to be issued.  Id.

However, the independence principle must work both ways.  The issue at bar relates to a dispute between the parties to the underlying contract.  Such a dispute is

9

independent of the letter of credit. Clark & Clark, supra, ¶ 14.02[1]; Compton, 831 F.2d at 590. The fact that Debtor seeks the return of funds that are proceeds of a letter of credit does not negate the breach of contract claim on the underlying obligation. See Global Network, 122 F.3d at 665. If the City's breach of the agreement is irrelevant to the bank's obligation to pay on the letter of credit, Security Servs., 132 B.R. at 414, the source of the funds must also be irrelevant to the Debtor's right to recover on the breach of contract claim. Thus, the real issue is whether the Debtor was entitled to the return of the funds under the terms of the agreement or as the result of a breach of the agreement, regardless of the source of the funds.

In this regard, the City raises two arguments: (1) the Debtor was not entitled to the return of cash reserve funds that the Debtor did not itself contribute; and (2) the bankruptcy court erred in finding that the liquidated damages provision was unenforceable.

1. Return of the Cash Reserve

Paragraph 14.2 governs the cash reserve requirement. It provides that the Debtor

> shall deposit with the City a cash reserve in an amount of two (2) times the amount of the maximum prize that is possible to be won in any regular game. In the event the [Debtor] offers a progressive keno game or other special or promotional game with a prize exceeding the maximum possible prize in a regular game, the [Debtor] must maintain the cash reserve or approved alternative security in an amount not less than the sum of the maximum prize possible to be won in the regular game plus the amount available to be won in the progressive, special, or promotional game.
>
> * * *
>
> The cash reserve for security shall be returned to the [Debtor] after all prizes and claims have been paid and settled at the termination of the Lottery Operator's Agreement.

When interpreting a contract, the court must give it a reasonable construction so as to give effect to the intent of the parties. Hammann v. City of Omaha, 417 N.W.2d 323,

10

327 (Neb. 1987). If the contract is unambiguous, the language of the contract controls. Kropp v. Grand Island Public School Dist. No. 2, 517 N.W.2d 113, 116 (Neb. 1994). However, if the contract is ambiguous, the court must determine the actual intent of the parties. Frenzen v. Taylor, 439 N.W.2d 473, 478 (Neb. 1989). Such a determination is a finding of fact reviewed for clear error. Mohamed v. UNUM Life Ins. Co., 129 F.3d 478, 480 (8th Cir. 1997).

Under Paragraph 14.2, the Debtor was required to maintain a cash reserve to secure payment of prizes, but it was entitled to the return of reserve funds upon the termination of the agreement. The City argues that the portion of the cash reserve originating from the draw on the letter of credit was not contributed by the Debtor; thus, the Debtor is not entitled to the return of that portion of the reserve. The agreement does not state whether the Debtor is entitled to a return of the funds if it did not directly make the contribution to the cash reserve. The agreement is, thus, ambiguous on this point.

The bankruptcy court found that the Debtor was still entitled to the return of the cash reserve even though it did not directly make the contribution. This conclusion is not clearly erroneous. Although the Debtor did not directly make the contribution to the cash reserve, it did incur an obligation to reimburse the bank as a result of the draw on the letter of credit. Accordingly, the Debtor has some interest in the return of the funds because such funds can be used to pay its obligation to the bank. Moreover, it is clear that the City had no right to the cash reserve once the Debtor paid all of the prizes. The City would, thus, receive a windfall if it were allowed to retain the cash reserve. The most logical finding as to the intent of the parties, therefore, is that the cash reserve should be returned to the Debtor upon the termination of the agreement regardless of the source of the funds, and the bankruptcy court did not err in so finding.

11

2. Liquidated Damages

Paragraph 31.1 of the agreement contains the liquidated damages provision:

> In complete and partial satisfaction of any material breach, liquidated damages may be chargeable to the letter of credit or performance bond in the following amounts:
> a) First material breach: $2500 per each day the breach continues or occurrence.
> b) Second and subsequent material breach: $5000 per each day the breach continues or occurrence.

A stipulated sum is for liquidated damages only (1) where the damages that the parties might reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages that would probably be caused by a breach or is reasonably proportionate to the damages that have actually been caused by the breach. Browning Ferris Indus. of Nebraska, Inc. v. Eating Establishment, 575 N.W.2d 885, 888 (Neb. Ct. App. 1998). Generally, the question of whether a sum mentioned in a contract is to be considered liquidated damages or a penalty is a question of law. Id.

When the City drew on the letter of credit asserting the liquidated damages provision, it alleged the following material breaches: (1) the failure to maintain adequate liability insurance; (2) the failure to maintain a $250,000 performance bond or letter of credit as a result of the initial draw on the letter of credit; and (3) the failure to make a timely application for renewal of its license.

It would not be difficult to ascertain the actual damages for any of these material breaches. The damages incurred by the City for the Debtor's failure to maintain liability insurance would be, at most, the difference between the amount of insurance the Debtor actually maintained and the amount it was required to maintain. Similarly, the damages

12

sustained by the City for the Debtor's failure to maintain a $250,000 letter of credit would be, at most, the difference between the amount available under the letter of credit and $250,000. Furthermore, the damages incurred by the City for the Debtor's failure to timely apply to renew its license easily could be calculated based on the City's average daily share of the gross proceeds for each day that the Debtor was unable to operate because it was without a license. Accordingly, the first requirement for enforcing a liquidated damages provision, that the damages would be difficult to ascertain, is not present.

Moreover, there is no indication that the liquidated damages are a reasonable estimate of actual damages that might be suffered. The agreement lists approximately fifteen types of material breaches. However, the liquidated damages provision provides the same recovery regardless of the type of breach. Indeed, the fact that the amount of damages doubles to $5,000 for the second breach indicates that the provision acts more as a penalty than an estimate of the actual damages. The liquidated damages claimed by the City also are not proportionate to the damages actually sustained. As the bankruptcy court found, the City did not sustain any damages as a result of the alleged material breaches.

In sum, actual damages would not be difficult to ascertain and the liquidated damages were not a reasonable estimate of actual damages or proportionate to actual damages. Accordingly, the bankruptcy court did not err in ordering the City to return the $71,340 attributable to the liquidated damages provision.

C.  Certificate of Deposit

The City's final argument is that the bankruptcy court erred in finding that the portion of the CD that was deposited prior to the August 1993 amendment was property

13

of the Debtor. The City maintains that all of the funds contributed to the CD came from the 1% of the gross proceeds to be used for the progressive jackpot, which was deducted from the City's share of the proceeds. As a finding of fact, the bankruptcy court determined that the Debtor began depositing approximately 1% of the gross proceeds in a money market account prior to the amendment that allowed the Debtor to deduct that amount from the City's share of the proceeds. Thus, the court found that the funds deposited before the August 1993 amendment were not deducted from the City's share of the proceeds. It concluded that all such funds and the interest thereon belonged to the Debtor.

The court's finding in this respect is not clearly erroneous. The evidence shows that the Debtor was not authorized to retain the 1% from the City's share of gross proceeds prior to August of 1993. The testimony of Harry Rudolph, the Debtor's president, indicated that the deposits prior to the amendment were not consistently made or exactly equal to 1% of the gross proceeds. Thus, there is ample evidence to find that the deposits made prior to August of 1993 were not the deposits contemplated by the amendment and did not come from the City's share of the gross proceeds. Accordingly, the court's finding that a portion of the CD belonged to the Debtor was not clearly erroneous.

Alternatively, the City argues that the funds in the CD were not the cash reserve contemplated by Paragraph 14.2 and, thus, did not have to be returned pursuant to Paragraph 14.2(g). The City maintains that the 1993 amendment eliminated the requirement of a cash reserve and replaced it with the requirement of a jackpot fund. The relevant portion of the amendment provides:

> As part of the recognized and accepted prize pay schedules contractor shall and is hereby authorized to pay one (1%) percent of the gross proceeds each month toward the Progressive Jackpot until said Jackpot reaches

14

$200,000. In any calendar month when the Progressive Jackpot is or remains at $200,000 the one (1%) percent contribution contemplated herein will be paid to the city in addition to that set forth in Paragraph 5.4 below.

Nothing in the amendment specifically eliminates the requirement of a cash reserve under Paragraph 14.2 or the requirement that the City return the cash reserve upon termination of the agreement pursuant to Paragraph 14.2(g). Thus, the amendment and agreement are ambiguous on this point, and the court's finding as to the actual intent of the parties is subject to a clearly erroneous standard of review. Mohamed v. UNUM Life Ins. Co., 129 F.3d 478, 480 (8th Cir. 1997).

The court determined that the funds in the CD represented the cash reserve required by Paragraph 14.2. The court's finding in this respect is not clearly erroneous. A reasonable interpretation of the agreement and the amendment was that the obligations under Paragraph 14.2 never changed and that the amendment merely clarified the source of the funding of the cash reserve. Indeed, the City's actions with respect to the cash reserve belie its arguments. The City drew $80,670 from the letter of credit in order to bring the cash reserve to $250,000, the amount required by the terms of Paragraph 14.2. If the amendment eliminated the requirement of a cash reserve, the City was only entitled to bring the fund to $200,000. Thus, there is sufficient evidence to support the court's finding that the CD represented the cash reserve required by Paragraph 14.2 and that the City, therefore, was required to return the funds pursuant to Paragraph 14.2(g).

CONCLUSION

Based on the foregoing, the decision of the bankruptcy court is affirmed, except that the amount of the judgment is adjusted to correct the court's mathematical error in determining the amount of interest earned on the CD. Thus, the City shall turn over to the Debtor $184,497.

15

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL