In re **SOUTHMARK CORPORATION,**
Debtor.

**SOUTHMARK CORPORATION,**
Plaintiff,

v.

**John E. RIDDLE, B. Lynn Riddle, and
Direct Mail Specialist, Defendants.**

**Bankruptcy No. 389–36324–SAF–11.
Adv. No. 391–3454.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Feb. 11, 1992.

Peter J. Riley, Thompson & Knight, P.C., Dallas, Tex., for Southmark Corp., debtor/plaintiff.

Margaret A. Mahoney, Weil, Gotshal & Manges, Dallas, Tex., for John E. Riddle and Lynn B. Riddle, defendants.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

On July 12, 1991, Southmark Corporation filed an adversary proceeding against John E. Riddle, B. Lynn Riddle, and Direct Mail Specialist (DMS) to avoid allegedly fraudulent and/or preferential transfers under 11 U.S.C. §§ 544, 547 and 548. On August 28, 1991, the Riddles moved to dismiss Southmark's complaint for failure to state a

claim upon which relief can be granted. The court held a hearing on the Riddles' motion to dismiss on November 12, 1991.

A proceeding to determine, avoid or recover fraudulent and/or preferential transfers constitutes a core matter over which this court has jurisdiction to enter a final judgment or order. 28 U.S.C. §§ 157(b)(2)(F) and (H) and 1334.

## I. Nature of the motion

The Riddles have moved to dismiss under Fed.R.Civ.P. 12(b)(6), made applicable to this adversary proceeding by Bankruptcy Rule 7012. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, under Rule 12(b), "If, on a motion asserting the defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). Where matters outside the pleadings are considered by the court on a motion to dismiss, Rule 12(b) requires the court to treat the motion as one for summary judgment, with the nonmovant being entitled to the procedural safeguards of Rule 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056. *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1283–84 (5th Cir.1990).

The Riddles presented to this court copies of state court special verdicts and a pledge and intercreditor agreement with their motion to dismiss. In response, Southmark presented the affidavit of Robert M. Galecke, its executive vice president and chief operating officer. In reply, the Riddles presented copies of state court and bankruptcy court pleadings, including Southmark's complaint in *Southmark vs.*

*Great American Insurance Co. (In re Southmark)*, adversary proceeding no. 391–3471 (Bankr.N.D.Tex.). Southmark, in turn, presented copies of a forbearance agreement, a mutual release, a state court judgment and an amendment to a state court judgment. The Riddles then presented a copy of a stipulation resolving the state court litigation and a copy of the agreement for an undertaking on appeal. The court accepted this affidavit and documentary evidence which were outside the pleadings. Neither the Riddles nor Southmark asked the court to exclude these matters and the court did not exclude them.

To the contrary, the parties extensively argued their points of law based on these matters outside the pleadings, both at the hearing on November 12, 1991, and in their series of written arguments. Accordingly, the court treats the Riddles' motion as a motion under Rule 56.

As the nonmovant, Southmark must receive the procedural safeguards of Rule 56. The Riddles served their motion and a memorandum of law with matters outside the record on Southmark on August 23, 1991. Southmark served its response and memorandum of law with the Galecke affidavit on September 12, 1991. The parties then exchanged another set of written arguments with matters outside the record. The court did not conduct its hearing until November 12, 1991. The court permitted a third exchange of written arguments. Southmark has received the procedural safeguards of Rule 56. No further discovery or hearings are necessary to address the motion under the standards of Rule 56. *Washington*, 901 F.2d at 1284.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and omissions on file, together with the affidavits, if any, and other matters presented to the court show that there is no genuine issue of material fact and that the Riddles are entitled to a judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Washington v. Armstrong World Indus-*

*tries Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). On a summary judgment motion the inferences to be drawn from the underlying facts must be viewed in the light most favorable to Southmark. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. A factual dispute bars summary judgment only when the disputed fact is determinative under governing law. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The Riddles bear the initial burden of articulating the basis for their motion and identifying evidence which shows that there is no genuine issue of material fact. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Southmark may not rest on the mere allegations or denials in its pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine the governing law. When the record taken as a whole and with inferences viewed in the light most favorable to Southmark could not result in a judgment for Southmark under governing law, summary judgment would be appropriate.

## II. Facts

In 1985, the Riddles sued, in the California Superior Court for San Diego County, Southmark, North American Corporation (NACO), DMS, both wholly owned Southmark subsidiaries, and others for fraud, tortious interference with contract, breach of contract and infliction of emotional distress. In September 1988 a jury awarded the Riddles a judgment against Southmark, NACO, DMS and others for actual and punitive damages totalling over $100 million. The jury found NACO and DMS liable for conspiracy, intentional interference with a purchase and sale contract, intentional interference with an employment contract, and intentional infliction of emotional distress. The jury found Southmark liable for fraud, breach of contract, and intentional infliction of emotional distress.

The California court denied Southmark's motion for a new trial on the condition that the Riddles accept a remittitur of certain damages. The Riddles accepted the remittitur. On November 2, 1988, the California court amended the judgment, awarding the Riddles $22,746,156 with $18,366,290 assessed against Southmark alone and $4,379,836 against Southmark, DMS, and NACO, jointly and severally.

Southmark appealed. Southmark obtained a supersedeas bond from Great American Insurance Company (GAIC) enabling Southmark to obtain relief from the judgment pending the appeal. On November 15, 1988, Southmark and GAIC executed an agreement for undertaking on appeal. GAIC issued a $34,119,194.40 bond to stay execution of the state court judgment. California law required that the bond equal 150% of the judgment to be stayed. West's Ann.Cal.Code Civ.Proc. § 917.1(b) (1989).

Also on November 15, 1988, Southmark, GAIC, and Drexel, Burnham, Lambert Incorporated entered a pledge and intercreditor agreement. Southmark granted GAIC a $45,000,000 security interest in $96,000,000 of marketable securities. The securities were subject to a first security interest securing margin loans made by Drexel to Southmark of approximately $51 million.

In June 1989 Southmark and the Riddles compromised their controversy. On July 6, 1989, Southmark and the Riddles entered a forbearance agreement under which the Riddles agreed to accept $16,525,000 in exchange for the release of the judgment. The parties agreed that the appeal would be dismissed and that the Riddles would have the right to immediately enforce the judgment up to $16,525,000 forbearing on the remainder provided the Riddles would not be required to repay, return or surrender the funds received. On July 10, 1989, Southmark and the Riddles executed a mutual release of claims.

On July 10, 1989, GAIC paid the Riddles $16,525,000. Southmark's complaint in this adversary proceeding alleges that GAIC paid the Riddles upon demand and then liquidated a portion of Southmark's collateral to reimburse itself.

Southmark filed a voluntary petition for relief under Chapter 11 of the U.S. Bank-

ruptcy Code on July 14, 1989. This court confirmed Southmark's Fourth Amended and Restated Plan of Reorganization on July 23, 1990. Southmark commenced this adversary on July 12, 1991.

Under the Bankruptcy Code, the Riddles are not insiders of Southmark. DMS is a Southmark insider. 11 U.S.C. §§ 101(2) and (31).

In this adversary proceeding, Southmark seeks to avoid the transfers to GAIC and the Riddles as fraudulent transfers under the Bankruptcy Code, 11 U.S.C. § 548, or under Texas law, 11 U.S.C. § 544(b) and Texas Bus. and Com.Code Ann. § 24.005 and 24.006 (Vernon 1990), and as preferences under 11 U.S.C. § 547. In their motion to dismiss, the Riddles contend that Southmark is not entitled to avoid any transfer to them as a matter of law.

### III. Section 547

Southmark's complaint alleges that both Southmark's transfer to GAIC and GAIC's payment to the Riddles constitute avoidable preferences under 11 U.S.C. § 547. Southmark may avoid "any transfer of an interest of the debtor in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case was a case under chapter 7 of this title ..."

11 U.S.C. § 547(b).

#### A. *Pledge Agreement*

■ The Riddles contend that Southmark made a transfer of a security interest under the pledge agreement more than 90 days before the date of filing of Southmark's bankruptcy petition. Southmark argues that it made the transfer within the 90 day non-insider preference period. Preferential transfers to non-insiders may be avoided only if made within 90 days before the filing of the bankruptcy petition whereas transfers to insiders may be avoided if made within one year before the date of the filing of the petition. 11 U.S.C. § 547(b)(4). Section 547(e)(2) provides that for purposes of § 547, "a transfer is made—(A) at the time such transfer takes effect between the transferor [Southmark] and the transferee [GAIC], if such transfer is perfected at, or within 10 days after, such time."

State law on the time of perfection controls. *In the Matter of T.B. Westex Foods, Inc.,* 950 F.2d 1187 (5th Cir.1992); *In re Emerald Oil Co.,* 807 F.2d 1234, 1236 (5th Cir.1987). New York law governs this case. *Pledge Agreement,* at Section 21. New York has adopted the Uniform Commercial Code. *Berkowitz v. Chavo International Inc.,* 74 N.Y.2d 144, 544 N.Y.S.2d 569, 542 N.E.2d 1086 (Ct.App.1989); New York Uniform Commercial Code (McKinney Supp.1989).

The pledged collateral consists of certificated stocks within the meaning of Article 8 of the Uniform Commercial Code. *Pledge Agreement,* Section 5, paragraphs (a)(5) and (b)(3). The transfer of a security interest in certificated securities from a transferor with rights in the security to a transferee who gives value is perfected and enforceable upon satisfying Uniform Commercial Code § 8–313(1). N.Y.U.C.C. § 8–321(1) and (2). When the elements of § 8–313(1) have been satisfied, perfection has occurred. *Uniform Law Annotated,* § 8–321, Official Reasons For 1977 Change. Section 8–313 provides in relevant part that:

(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only:

(a) at the time that he or a person designated by him acquires possession of a certificated security; ...

(h) with respect to the transfer of a security interest where the debtor has signed a security agreement containing a description of the security, at the time a written notification which, in the case of the creation of the security interest is signed by the debtor ... is received by

(i) a financial intermediary on whose books the interest of the transferor in the security appears ...

(4) A "financial intermediary" is a bank, broker, clearing corporation, or other person (or the nominee of any of them) which in the ordinary course of its business maintains security accounts for its customers and is acting in that capacity. A financial intermediary may have a security interest in securities held in account for its customer

The Riddles assert that GAIC perfected its interest in the securities by possession by Drexel on November 15, 1988. Citing N.Y.U.C.C. §§ 8–321(1) and 8–313(1)(a), the Riddles contend that Drexel held the securities as GAIC's agent or bailee and, by doing so, perfected GAIC's interest. *Landmark Land Co. v. Sprague,* 529 F.Supp. 971 (S.D.N.Y.1981), *rev'd on other grounds,* 701 F.2d 1065 (2nd Cir.1983); *In re Copeland,* 531 F.2d 1195 (3rd Cir.1976). The Riddles argue that Southmark's lack of actual possession combined with Drexel's public control on GAIC's behalf notifies prospective creditors of claims against the securities. *Hassett v. Blue Cross & Blue Shield of Greater New York,* 46 B.R. 661 (Bankr.S.D.N.Y.1985).

Southmark responds that Drexel, as Southmark's broker and primary banker, may not serve as an agent or bailee for perfection purposes. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Van Kylen (In the Matter of Van Kylen),* 98 B.R. 455, 464 (Bankr.W.D.Wis.1989). Further, Southmark contends that because it exercised dominion and control over the pledged securities, prospective creditors did not receive constructive notice. *Id.* at 466–467; *U.L.A.,* § 9–305, comment 2 (1977).

However, while § 8–313(1)(a) governs transfers of securities generally, § 8–313(1)(h) governs transfers of security interest specifically. *In re Domestic Fuel Corp.,* 70 B.R. 455, 460 (Bankr.S.D.N.Y. 1987). The pledge agreement creates a security interest:

[Southmark] hereby pledges, assigns, hypothecates and transfers to Pledgees all of the Pledged Securities *and* hereby grants to [GAIC] a security interest in the Pledged Securities....

This Agreement shall be deemed to be ... a notice from GAI to Drexel *meeting the requirements of Section 8–313(1)(h) of the New York Uniform Commercial Code with respect to the perfection of the security interest created hereby.*

*Pledge Agreement,* Section 1 (emphasis added). Southmark purported to transfer a security interest. Therefore, the specific provisions of § 8–313(1)(h) govern the determination of when perfection occurred.

No genuine issue of material fact exists that GAIC perfected its security interest on November 15, 1988, under N.Y.U.C.C. § 8–313(1)(h). The pledge agreement creates a security interest in certificated stocks. The purchaser of that interest, GAIC, gave value. The pledge agreement is a security agreement and adequately describes the securities involved. The description of a specific account containing securities satisfies this element. The pledge agreement is signed by the debtor, Southmark. Drexel is acting in its capacity as a financial intermediary on whose books appears Southmark's interest in the certificated securities. Drexel received notice of the pledge agreement by signing it on November 15, 1988.

GAIC therefore perfected its security interest on November 15, 1988. Southmark transferred the security interest to GAIC under the pledge agreement for purposes of § 547 on November 18, 1988. Since Southmark filed its bankruptcy petition on July 14, 1989, a transfer on November 18, 1988, is subject only to the non-insider preference period.

B. *Security Interest*

1. Transfer to GAIC

On November 15, 1988, Southmark transferred to GAIC a $45,000,000 security in-

terest in marketable securities and $700,-000 to purchase a supersedeas bond of $34,119,194.40. Southmark made this transfer more than ninety days prior to filing its bankruptcy petition. GAIC is not a Southmark insider. Neither transfer to GAIC may be avoidable under § 547.

■ Moreover, Southmark cannot avoid the transfer because even if a preference to GAIC, GAIC gave new value in return. Under § 547(c)(1) a transfer intended to be and which, in fact, is a contemporaneous exchange for new value, is not avoidable. There is no genuine dispute that GAIC delivered the supersedeas bond on November 15, 1988, when Southmark executed the pledge agreement and paid $700,000.

### 2. Transfer to the Riddles

Southmark contends that the transfer to GAIC created an indirect preferential transfer to the Riddles.

In the Fifth Circuit, an indirect preferential transfer occurs when a grantor pledges collateral to an intermediary bank for the issuance of a letter of credit to the beneficiary. The pledge created an indirect transfer to the beneficiary on the date the pledge was made. To avoid the indirect transfer as a preference, the debtor must establish each element of § 547. *Kellogg v. Blue Quail (In the Matter of Compton)*, 831 F.2d 586 (5th Cir.1988), *modified on other grounds*, 835 F.2d 584 (1988).

Southmark pledged collateral to GAIC for the issuance of a supersedeas bond for the benefit of the Riddles. Under *Compton*, the Riddles received an indirect transfer. However, there is no genuine dispute that the Riddles were not Southmark insiders on the date of the transfer. The transfer occurred more than ninety days prior to Southmark's bankruptcy filing. Therefore, Southmark cannot avoid the indirect transfer to the Riddles as a preference.

Southmark argues, however, that the court should analyze the transfer under *Levit v. Ingersoll Rand Financial Corp. (In the Matter of Deprizio)*, 874 F.2d 1186, 1191 (7th Cir.1989), decided after *Compton*. Under *Deprizio* a transfer to a non-insider creditor that benefits an insider creditor may be avoided as a preference if made between ninety days and one year before the date of the filing of the bankruptcy petition. In *Deprizio*, the debtor paid a promissory note to a non-insider creditor guaranteed by an insider creditor more than 90 days but before one year prior to the bankruptcy filing. Because the debtor's payment benefitted the insider by reducing his contingent liability, the Seventh Circuit held that a trustee could recover from the non-insider creditor under §§ 547 and 550. The Seventh Circuit's analysis in *Deprizio* differs conceptually from the Fifth Circuit's analysis in *Compton* and may actually reject *Compton*. *Id.* at 1195–1196. Even though this court must apply *Compton*, *Deprizio* leads to the same result in this case.

Southmark's transfer to GAIC benefitted the Riddles. The pledged security interest transformed the Riddles from unsecured judgment creditors to creditors secured by the supersedeas bond. However, Southmark cannot invoke the extended preference period because the Riddles, unlike the guarantor in *Deprizio*, are not insiders. The transfer benefitted the Riddles as non-insiders more than ninety days prior to the bankruptcy filing. Therefore, Southmark cannot avoid the transfer.

### 3. Transfer to DMS

■ DMS, as a wholly owned subsidiary of Southmark, is an insider. The Riddles' judgment included an award against Southmark and DMS, jointly and severally, for $4,379,836. Under *Deprizio*, Southmark's pledge of collateral to GAIC for the issuance of the supersedeas bond benefitted DMS. The supersedeas bond prevented the Riddles from levying execution of their judgment against DMS. Under *Compton*, the transaction may have been an indirect transfer to DMS. Southmark therefore argues that the one year insider preference period should apply.

Even though DMS received a benefit by the transfer, to be a preference DMS must be a Southmark creditor for purposes of § 547. The transfer must be "for the benefit of a creditor ... for or on account of

an antecedent debt owed by the debtor." § 547(b)(1) and (2). The Riddles contend that the judgment did not create a claim by DMS against Southmark. The Riddles argue that under California law DMS could not assert a claim against Southmark for contribution or indemnification. Therefore, the Riddles continue, DMS was not a Southmark creditor and the transfer by Southmark was not for or on account of an antecedent debt owed by Southmark to DMS.

■ DMS' joint and several liability to the Riddles rests solely upon intentional torts against the Riddles: conspiracy, intentional interference, and intentional infliction of emotional distress. *See Vieux v. East Bay Regional Park District,* 906 F.2d 1330, 1343 (9th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990) (civil conspiracy is an intentional tort). Under California law DMS may not recover from Southmark by contribution or indemnity for intentional torts. *See* West's Ann.Cal.Civ.Proc.Code § 875(d) ("no right of contribution in favor of any tortfeasor who has intentionally injured the injured person"); *Allen v. Sundean,* 137 Cal. App.3d 216, 226, 186 Cal.Rptr. 863, 869 (1 Dist.1982); *Riverhead Savings Bank v. National Mortgage Equity Corp.,* 893 F.2d 1109, 1116 (9th Cir.1990); *In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 682 F.Supp. 1073, 1089 (C.D.Cal.1987). Even if Southmark's transfer to GAIC benefitted DMS, absent a claim for contribution or indemnity, DMS did not benefit as a creditor of Southmark under § 547(b)(1) and Southmark did not make the transfer for or on account of an antecedent debt owed by Southmark to DMS under § 547(b)(2).

Southmark argues that Southmark's debt to DMS need not arise from the California judgment to make DMS a creditor for purposes of § 547. The court rejects this contention. For purposes of preferences under § 547, DMS must have claim against Southmark based on the Riddles' judgment to be a creditor under that section. *See Southmark vs. Southmark Per-sonal Storage (In re Southmark),* 138 B.R. 831 (Bankr.N.D.Tex.1992).

Therefore, the court concludes that Southmark's transfer to GAIC does not constitute a preference to GAIC, the Riddles, or DMS.

### C. *Satisfaction of Judgment*

■ On July 10, 1989, GAIC paid the Riddles $16,525,000 pursuant to the forbearance agreement between Southmark and the Riddles. Pursuant to the pledge agreement, GAIC liquidated a portion of Southmark's pledged securities to cover the payment to the Riddles. Southmark contends that GAIC's payment to the Riddles constitutes an avoidable preference.

The Riddles argue that GAIC's payment to them did not involve a transfer of an interest of the debtor in property. Under § 547(b) Southmark may avoid a "transfer of an interest of the debtor in property." Under the forbearance agreement, the Riddles could demand payment from GAIC on their judgment in the amount of $16,525,-000. Pursuant to the undertaking on appeal, GAIC honored that demand. Southmark argues that GAIC, in effect, paid the Riddles with the proceeds of Southmark's pledged securities. The Riddles maintain that GAIC paid them from the undertaking with GAIC assets.

Courts disagree on whether a bankruptcy estate obtains an interest in a supersedeas bond or its proceeds. *Compare Carter Baron Drilling v. Excel Energy Corp.,* 76 B.R. 172, 174 (D.Colo.1987); *Moran v. Johns Mansville Sales Corp.,* 28 B.R. 376 (N.D.Ohio 1983); *In re North American Marketing Corp.,* 24 B.R. 16 (Bankr. S.D.Fla.1982); and *Atlantic Richfield Co. v. Good Hope Refineries,* 604 F.2d 865, 868–870 (5th Cir.1979) (surety bond and proceeds not protected by automatic stay); *In re Celotex Corp.,* 128 B.R. 478 (Bankr. M.D.Fla.1991); *In re Fleming Roberts Corp. Ltd.,* 60 B.R. 353, 356 (Bankr. S.D.Tex.1986); and *Borman v. Raymark Industries Inc.,* 946 F.2d 1031, 1034 (3rd Cir.1991) (criticizing exclusion of supersedeas bonds).

By analogy to *Compton*, 831 F.2d at 589–91, this court concludes that GAIC's transfer to the Riddles did not transfer an interest of Southmark in property. The supersedeas bond or undertaking on appeal resembles the secured letter of credit analyzed in *Compton*. With a secured letter of credit, the grantor has a liability to the beneficiary of the letter of credit. With a secured supersedeas bond, the grantor has a liability to the beneficiary of the bond. With a secured letter of credit, the grantor transfers its property including the security interest to the issuing bank. With a secured supersedeas bond, the grantor transfers its property including the security interest to the issuing entity. With a secured letter of credit, the issuing bank pays the beneficiary on the letter of credit upon proper demand by the beneficiary. With a secured supersedeas bond, the issuing entity pays the beneficiary on the bond upon proper demand by the beneficiary. With a secured letter of credit, after payment to the beneficiary, the issuing bank looks to the pledged collateral of the grantor to be made whole. With a secured supersedeas bond, after payment to the beneficiary, the issuing entity looks to the pledged collateral of the grantor to be made whole.

With a secured letter of credit, the issuing bank has an obligation to pay the beneficiary independent of the underlying obligation between the grantor and the beneficiary. With a secured supersedeas bond, the issuing entity has an obligation to pay the beneficiary independent of the underlying obligation between the grantor and the beneficiary. With the secured letter of credit, the issuing bank's independent obligation to the beneficiary protects the beneficiary as a creditor of the grantor. With the secured supersedeas bond, the issuing entity's independent obligation to the beneficiary protects the beneficiary as a creditor of the grantor.

Therefore, as with a secured letter of credit, the transfer of a debtor's interest in property takes place when the security interest is granted, not at the time the issuer pays on the bond. As with a secured letter of credit, the bond itself and the payments thereunder do not constitute property of the debtor. However, as with a secured letter of credit, the debtor retains an interest in the collateral pledged as a security interest for the bond.

This analysis comports with the reasoning of the courts that have held that a supersedeas bond and its proceeds do not constitute property of a bankruptcy estate.

> The principal risk against which such bonds are intended as a protection is insolvency. To hold that the very contingency against which they guard shall, if it happen, discharge them, seems to us bad law and worse logic.

*In re Alwan Brothers Co.*, 112 B.R. 294, 296 (Bankr.C.D.Ill.1990), *quoting, Stone v. Hole*, 75 Colo. 115, 116, 223 P. 1085 (1924); *Carter Baron*, 76 B.R. at 174. Interference with the state statutory system regulating appeals and the protection of judgment creditors should not be taken lightly. *In re Smith*, 58 B.R. 448, 451 (Bankr. W.D.Ky.1986).

GAIC's payment to the Riddles did not transfer an interest of Southmark in property, and cannot be avoidable under § 547(b). GAIC's foreclosure and liquidation of the pledged securities did transfer an interest of Southmark in property but any resulting cause of action is not the subject of this adversary proceeding. Southmark presents no summary judgment evidence that GAIC paid the Riddles with the proceeds of Southmark's liquidated securities. To the contrary, Southmark alleges that GAIC paid the Riddles first and then liquidated the collateral.

The Riddles are entitled to a judgment of dismissal on Southmark's preferential transfer claims under § 547.

## IV. Section 548

Southmark's complaint alleges that both Southmark's transfer to GAIC and GAIC's payment to the Riddles constitute avoidable fraudulent transfers under 11 U.S.C. §§ 548 and 544(b), incorporating Texas state law.

The Riddles contend that Southmark can avoid neither the transfer to GAIC nor the

payment to the Riddles because Southmark received reasonably equivalent value for those transfers. The Riddles argue that GAIC's payment to the Riddles was not a transfer of an interest of Southmark in property. Southmark claims that it received less than reasonably equivalent value for the transfers because the Riddles' judgment would have been an unsecured claim in the Southmark bankruptcy case worth only $2,200,000 under Southmark's confirmed plan of reorganization.

Under § 548 Southmark may avoid

> (a) ... any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation ...

11 U.S.C. § 548. For purposes of § 548, "value" includes property and the securing of a present or antecedent debt of the debtor. § 548(d)(2)(A).

Section 544(b) enables Southmark to avoid fraudulent transfers under Texas law. The Texas Fraudulent Transfer Act (TFTA) requires the transferor to prove it received less than reasonably equivalent value in exchange for the transfer. Tex. Bus. & Com.Code Ann. §§ 24.005 and 24.006 (Vernon 1987). By definition, "reasonably equivalent value" under the TFTA includes a transfer that is within the range of values for which the transferor would have willfully sold the assets in an arms-length transaction. Tex.Bus & Com.Code Ann. § 24.004(d) (Vernon 1987).

A. *Security Interest*

■ On November 15, 1988, Southmark executed the pledge agreement which granted GAIC a security interest in $45,000,000 of stock owned by Southmark. Granting a security interest constitutes a transfer of an interest of the debtor in property. *In the Matter of Cavalier Homes of Georgia Inc.*, 102 B.R. 878, 886 (Bankr.M.D.Ga.1989); *In re Ohio Corrugating Co.*, 91 B.R. 430, 437 (Bankr. N.D.Ohio 1988). Securities valued at $96,000,000 were subject to a first security interest securing margin loans made by Drexel to Southmark of approximately $51 million, leaving the $45,000,000 of value to secure GAIC's bond.

The Riddles held a judgment in the amount of $22,746,156 against Southmark. To stay execution pending appeal, California law required a bond equal to 150% of the judgment to be stayed.

In exchange for the pledge of a net security interest in $45,000,000 of stock, GAIC issued the $34,119,194.40 supersedeas bond. GAIC became liable for all obligations arising from the undertaking agreement or resulting from margin loans made by Drexel to finance Southmark's acquisition of the pledged securities. *Pledge Agreement*, Section 1. GAIC also became liable for all costs incurred by a foreclosure and all obligations of Drexel in connection with the pledge agreement. *Id.* at Section 7. These obligations had to be satisfied before GAIC received any payment for the securities.

■ Reasonably equivalent value requires a comparison of the value of what went out with the value of what came in. *In re Grabill Corp.*, 121 B.R. 983, 994 (Bankr.N.D.Ill.1990). There need not be a dollar for dollar exchange to satisfy the reasonable equivalence test. *In re Countdown of Connecticut Inc.*, 115 B.R. 18 (Bankr.D.Conn.1990); *Matter of Emerald Hills Country Club*, 32 B.R. 408 (Bankr. S.D.Fla.1983). The aggregate amount of the Riddles' judgment, the requirements of California law and the liabilities incurred by GAIC constitute reasonably equivalent value to Southmark for the $45,000,000 net security interest.

Moreover, and dispositively, Southmark was never at risk for more than the cost of resolving its dispute with the Riddles. If GAIC paid the Riddles upon proper demand

on the bond, GAIC could liquidate the collateral up to the amount of the demand and related obligations under the pledge agreement but had to return the unused portion of the collateral. Section 16 of the pledge agreement, entitled "Redelivery of Collateral," states

> Upon the discharge or payment in full of the Obligations, the Pledged Securities and any and all rights received by Pledgees during the time the same was held by Pledgees shall be deemed immediately transferred to Pledgor.

This reversion guaranteed that Southmark would receive reasonably equivalent value in exchange for the pledge of securities. The satisfaction of judgment plus GAIC's costs of liquidating the securities plus Southmark's reversionary interest in the remaining securities reasonably equals the $45,000,000 net security interest transferred.

### B. Satisfaction of Judgment

■ GAIC's payment to the Riddles did not transfer an interest of Southmark in property. See supra Section III.C. Southmark does not have an interest in the bond or its proceeds. Southmark does have a reversionary interest in the pledged securities. As under the preference analysis, GAIC's liquidation of the pledged securities did transfer an interest of Southmark in property but any resulting cause of action is not the subject of this adversary proceeding.

■ Moreover, any payment to the Riddles was made for reasonably equivalent value. On July 10, 1989, GAIC paid the Riddles $16,525,000 on the supersedeas bond. In exchange, the Riddles released a judgment worth over $22,000,000. By virtue of the pledge agreement, GAIC could liquidate Southmark's collateral only to sat-

isfy the Riddles' judgment and related obligations and then return the remainder to Southmark. Any dispute concerning the remaining collateral involves Southmark and GAIC, not the Riddles.

Finally, if Southmark's pledge to GAIC constituted an indirect transfer to the Riddles, Southmark still received reasonably equivalent value for the transfer.[1] Again, Southmark was assured that its collateral would be liquidated only to the extent necessary to reimburse GAIC for its satisfaction of the Riddles' judgment and related obligations. GAIC was obligated to return the remaining collateral to Southmark. Therefore, Southmark was certain to, and did in fact, receive reasonably equivalent value for a transfer to the Riddles.

Therefore, the court concludes that neither Southmark's payment and pledge to GAIC nor GAIC's payment to the Riddles constitutes a fraudulent transfer under either § 548 or TFTA. The Riddles are entitled to a dismissal of the § 548 and § 544(b) claims against them.

### V. Conclusion

Under governing law, the transfers challenged by Southmark cannot be avoided against the Riddles under §§ 544(b), 547 or 548. Southmark cannot obtain a judgment against the Riddles under those sections or 11 U.S.C. § 550. Accordingly, the Riddles' motion to dismiss, treated as a motion for summary judgment, is granted. The Southmark complaint against the Riddles must be dismissed.

---

**1.** Although avoidances of preferences under § 547 and fraudulent conveyances under § 548 serve different functions under the Bankruptcy Code, the direct/indirect transfer analysis of preferences used in *Compton* appears to apply to fraudulent transfers. First, *Compton* relied upon the Code definition of transfer to support its two-transfer theory. 831 F.2d at 592, fn. 6. This definition applies to both fraudulent and preferential transfers. Second, the *Compton* court insisted that each transfer, direct or indirect, should be analyzed independently. *Id.* at 594. This detaches the direct/indirect doctrine from any specific provision of § 547. Third, the rationale for the direct/indirect doctrine is to "look through the form of a transaction and determine which entity actually benefitted from the transfer." *Id.* at 595. This rationale would appear to apply to fraudulent transfers.