In re HECHINGER INVESTMENT
COMPANY OF DELAWARE,
INC., et al., Debtors.

Hechinger Investment Company
of Delaware, Inc., Plaintiff,

v.

Allfirst Bank, Defendant.

Bankruptcy No. 99–02261(PJW).
Adversary No. 00–138.

United States Bankruptcy Court,
D. Delaware.

July 29, 2002.

Neal J. Levitsky, Agostini, Levitsky, Isaacs & Kulesza, Wilmington, DE, William L. Hallam, Gebhardt & Smith LLP, Baltimore, MD, for Defendant Allfirst Bank.

Mark D. Collins, Margreta M. Sundelin, Richards, Layton & Finger P.A., Wilmington, DE, Brian E. O'Connor, Carollynn H.G. Pedreira, Willkie Farr & Gallagher, New York City, Co–Counsel for Debtors and Debtors in Possession.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the motion (Doc. # 7) of Allfirst Bank ("Allfirst" or "Defendant") to dismiss the adversary complaint (Doc. # 1) ("Complaint") filed against it by Hechinger Investment Company of Delaware, Inc. ("Debtor" or "Plaintiff"). The motion seeks dismissal pursuant to Fed. R.Civ.P. 12(b)(6) [1] ("Rule 12(b)(6)") for failure to state a claim upon which relief may be granted. For the reasons discussed below, I will grant the motion with respect to Count II, but deny the motion with respect to Counts I, III and IV.

## BACKGROUND

Debtor and certain of its affiliates (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 11, 1999 ("Petition Date"). (Complaint ¶ 1.) That same date, this Court entered an order ("Account Order") (Doc. # 21, Case No. 99–2261) authorizing Debtors to continue to use their existing pre-petition bank accounts ("Accounts"), and authorizing and directing the banks at which such Accounts were maintained to continue to service the Accounts postpetition in the usual and ordinary course, subject only to not honoring checks issued or drawn on the Accounts pre-petition.[2] (Complaint ¶ 8–9.)

---

1. Fed.R.Civ.P. 12(b)(6) is applicable in this proceeding pursuant to Fed. R. Bankr.P. 7012.

2. An exception was made for checks authorized under a separate Wage Order as defined in Debtors' Motion for Order Authorizing

Maintenance of Prepetition Bank Accounts, Continued Use of Existing Business Forms and Continued Use of Existing Books and Records (Doc. # 20, Case No. 99–2261) ("Bank Account Motion"). (Complaint ¶ 8.)

On or about June 15, 1999, Defendant, f.k.a. FMB Bank, and its affiliate, Allfirst Financial Center National Association, f.k.a. First Omni Bank, N.A. ("AFCNA" and collectively with Defendant, the "Maryland Banks") filed an emergency motion (Doc. # 27, Case No. 99–2261) ("Emergency Motion I") seeking relief from the Account Order. (Complaint ¶ 10.) Prior to the date of the scheduled hearing on such motion, an agreement was reached between Debtors, the Maryland Banks and Debtors' postpetition lenders ("DIP Lenders") providing for certain clarifications and modifications to the Account Order and for a transition period to close all of Debtors' Accounts maintained with the Maryland Banks with the exception of the Account numbered 191–83898 ("Depository Account"). (*Id.*) After being revised in accordance with requests made by the Creditors' Committee ("Committee"), this agreement was embodied in a proposed consent order ("Consent Order") approved by this Court on or about July 6, 1999.[3]  (*Id.*)

Among other things, the Consent Order authorized and directed the Maryland Banks, on the first business day following the entry of the Consent Order, to close all of Debtors' Accounts maintained therewith other than the Depository Account and the Accounts numbered 191–84006 (the "Payroll Account") and 191–83994 (the "Master Account"). (*Id.* at ¶ 11; Consent Order ¶ 6.) The Consent Order also authorized and directed the Maryland Banks to close the Payroll and Master Accounts on or before July 23, 1999 ("Termination Date").[4] (Complaint ¶ 11; Consent Order ¶ 6.) Upon closing these Accounts, the Maryland Banks were to remit to Debtors within two days of the termination thereof the

funds on deposit in the Accounts less a reserve of $160,000.00 ("Reserve") in the Master Account to cover any fees and expenses "as may be allowed by further Order of this Court". (Consent Order ¶ 7; Complaint ¶ 12.) To insure that funds would be available to fund the Reserve upon the closing of the Master Account, the Consent Order provides:

> [Defendant] be, and it hereby is, authorized to place an administrative hold on funds on deposit in the Master Account in the amount of the Reserve, subject to further Order of this Court. The Maryland Banks shall file an Application for allowance of fees and expenses no more than ten business days after the Termination Date (the "Application Date") and give notice of such Application to [Debtor], Hechinger Property, the DIP Lender, the U.S. Trustee and the Committee.

(Consent Order ¶ 7.)

With respect to Debtors' Depository Account, the Consent Order provides that such Account was to be closed on August 2, 1999 unless Debtor obtained and delivered to Defendant an "Acceptable Substitute LC" on or before that date. (*Id.* at ¶ 9.) An "Acceptable Substitute LC" is defined in the Consent Order as:

> an irrevocable standby letter of credit or an amendment to letter of credit number 50087859 issued by BankBoston, N.A. on March 31, 1999 (the "Existing LC") that: (a) is issued to [Defendant], as beneficiary: [sic] (b) is issued by BankBoston, N.A. or another issuer acceptable to [Defendant]; (c) is in the amount of One Million Five Hundred Thousand Dollars ($1, 500,000.00); (d) *permits drawings on the same terms*

---

3.  The Consent Order (Doc. # 169, Case No. 99–2261) is attached to the Complaint as Exhibit A and will herein be cited to as "Consent Order ¶ __".

4.  Either Account closing deadline could be extended by the parties' written agreement. (Consent Order ¶ 6.)

*and condition under which drawings are permitted under the Existing LC;* (e) has a date of expiry of not less than three months after the date of issuance; and (f) provides that its date of expiry shall be automatically extended for successive periods equal to the number of calendar days between the date of issuance and the original date of expiry unless, not less than thirty calendar days prior to the original date of expiry or any applicable extension thereof, the issuer notifies [Defendant], in writing, that the date of expiry then in effect will not be extended.

*(Id.)* (emphasis added). In the event Debtor obtained an Acceptable Substitute LC on or before August 2, 1999, the Consent Order provides that the "Depository Account Closing Date shall be the fifteenth calendar day after the issuer of the Acceptable Substitute LC notifies [Defendant] that the expiration date of the Substitute Acceptable LC [sic] will not be extended." *(Id.;* Complaint ¶ 14.) The Consent Order further provides:

*From and after the Petition Date and until the Depository Account Closing Date, [Defendant] may debit the Depository Account for the amount of any items deposited to the Depository Account and subsequently dishonored by the institutions by which they are payable or otherwise reversed and for its usual and customary fees, but not for attorneys' fees and expenses.* In the event [Defendant] incurs attorneys' fees and expenses relating to its account relationship with [Debtors] after the Termination Date and prior to the Depository Account Closing Date, [Defendant] may withhold the actual amount of such fees and expenses plus Three Thousand

Dollars ($3,000.00) to cover estimated fees and expenses to be incurred in connection with the collection gap thereof ("Gap Fees") from the funds transferred to the main concentration account maintained with BankBoston, N.A. as security for payment of the Gap Fees. The allowance of Gap Fees shall be subject to further Order of this Court. The Maryland Banks shall file an Application for allowance of Gap Fees no more than ten business days after the Depository Account Closing Date (the "Gap Application Date") and give notice of such Application to [Debtor], Hechinger Property, the DIP Lender, the U.S. Trustee and the Committee.

(Consent Order ¶ 9) (emphasis added).

On or about July 12, 1999, Debtor obtained an Acceptable Substitute LC from BankBoston, N.A. ("BankBoston") by extending the terms of the Existing LC referenced in paragraph 9 of the Consent Order.[5] (Complaint ¶ 12.) Although the expiration date of the Acceptable Substitute LC was originally established as October 12, 1999, such date was subsequently automatically extended to January 12, 2000. *(Id.;* Def.'s Mem. (Doc. # 7) at 3.) The Acceptable Substitute LC "permits drawings on the same terms and condition under which drawings are permitted under the Existing LC" (Consent Order ¶ 9) and provides that all or any portion of the amount provided for therein shall be available for draw by Defendant upon the presentation of a draft accompanied by a certification, purportedly signed by one of Defendant's officers, which states:

The amount of this drawing USD_____ under BankBoston, N.A. Letter of Credit No. 50087859 represents the amount due and unpaid at

---

5. The Acceptable Substitute LC is attached to the Complaint as Exhibit B and will herein be cited as "Acceptable Substitute LC at __".

the time by HSC, Hechinger Company, Hechinger Property Company and/or [Debtor] with respect to: A. Charge-backs to any deposit accounts maintained with us and/or [AFCNA] by HSC, Hechinger Company, Hechinger Property Company and/or [Debtor] ("Account") and/or; B. *The absence of sufficient collected funds on deposit in any account(s) to make payment of checks, wire transfers, automated clearing house transfers, drafts and other debits thereto.*

(Acceptable Substitute LC at 1) (emphasis added).

On or about September 17, 1999, Outdoor Technologies, Inc. ("OTI"), one of Debtors' suppliers, commenced an action ("Action") against Defendant in the Delaware Superior Court for fraud, conspiracy, negligent misrepresentation and breach of contract arising out of Defendant's conduct in connection with OTI's pre-petition attempts to present for payment one of Debtors' checks drawn on Defendant.[6] (Complaint ¶ 15.) Subsequently, on October 14, 1999, Defendant filed an emergency motion (Doc. # 865, Case No. 99–2261) ("Emergency Motion II") seeking an order modifying the Consent Order to permit Defendant to place an administrative hold on the funds remaining in Debtors' Depository Account as security for any right to indemnification it purportedly has against Debtors arising out of its defense of the Action. (Complaint ¶ 16.) After conducting a hearing on Emergency Motion II on or about October 25, 1999, this Court entered a preliminary order (Doc. # 1064, Case No. 99–2261) ("Preliminary Order") authorizing Defendant to place an administrative hold on the funds then in the Depository Account, net of pending items,

during the pendency of Emergency Motion II. (Complaint ¶ 17.) Thereafter, on November 23, 1999, Defendant filed another emergency motion (Doc. # 1273, Case No. 99–2261) ("Emergency Motion III") seeking to modify the Preliminary Order to increase the administrative hold authorized therein to cover additional funds credited to Debtors' Depository Account subsequent to the issuance thereof. (Complaint ¶ 18.) After conducting another hearing on the matter, the Court granted Defendant's Emergency Motion III. (*Id.*)

On December 10, 1999, BankBoston notified Defendant that Debtor had informed BankBoston that the Acceptable Substitute LC would not be renewed and, as a result, would expire on January 12, 2000. (*Id.* at ¶ 19.) Thereafter, on December 29, 1999, subsequent to the Depository Account Closing Date, Defendant drew down on the Acceptable Substitute LC in the amount of $194,190.61 ("Drawn Funds"). (*Id.* at ¶ 20.) In support of its draw ("Draw"), Defendant submitted a sight draft ("Draft") along with a signed certification ("Certification") stating:

THE AMOUNT OF THIS DRAWING USD194,190.61 UNDER BANKBOSTON, N.A. LETTER OF CREDIT NO. 50087859 REPRESENTS THE AMOUNT DUE AND UNPAID AT THE TIME BY HSC, HECHINGER COMPANY, HECHINGER PROPERTY COMPANY, AND/OR [DEBTOR] WITH RESPECT TO: A. CHARGE-BACKS TO ANY DEPOSIT ACCOUNTS MAINTAINED WITH U.S. AND/OR [AFCNA] BY HSC, HECHINGER COMPANY, HECHINGER PROPERTY COMPANY, AND/OR [DEBTOR] ("ACCOUNT") AND/OR: B. THE ABSENCE OF SUFFICIENT

---

6. OTI alleges that as a result of Defendant's conduct, it was unable to negotiate Debtors' check for payment prior to the Petition Date and consequently, has not been paid for certain merchandise. (Complaint ¶ 15.) The amount in dispute is $706,735.62. (*Id.*)

COLLECTED FUNDS ON DEPOSIT IN ANY ACCOUNT(S) TO MAKE PAYMENT OF CHECKS, WIRE TRANSFERS, AUTOMATED CLEARING HOUSE TRANSFERS, DRAFTS AND OTHER DEBITS.

(*Id.*)[7] In response to an inquiry from Debtors' counsel on January 3, 2000, counsel for Defendant advised that the purpose of the Draw was to reimburse Defendant for attorneys' fees incurred in connection with the Action and Emergency Motions II and III, as well as other attorneys' fees incurred in the Debtors' chapter 11 cases. (Complaint ¶ 21.) Thereafter, by letter dated January 6, 2000, Debtors' counsel notified Defendant that the Draw had been improper and demanded prompt repayment of the Drawn Funds. (*Id.* at ¶ 22.) Defendant did not remit the Drawn Funds to Debtors. (*Id.*)

Debtor commenced the instant adversary proceeding on January 26, 2000. Debtor seeks damages, interest, costs and attorneys' fees based on Defendant's alleged improper Draw on the Acceptable Substitute LC and its failure to credit and/or account for certain funds which Debtor alleges were deposited into the Depository Account, but for which Debtors have not been credited. (*Id.* at 15.) Specifically, Count I of the Complaint alleges that Defendant's Draw for attorneys' fees and expenses subsequent to the Depository Account Closing Date constitutes a breach of the Consent Order and an impermissible Draw under the terms of the Acceptable Substitute LC which resulted in a reimbursement obligation on the part of Debtor to BankBoston. (*Id.* at ¶¶ 23–31.) Count II alleges that the Drawn Funds, of which Defendant is in possession, are funds that Debtor can use under 11 U.S.C. § 363, and therefore, constitute property of Debtor's estate ("Estate") that is not of inconsequential value and/or benefit to the Estate, and to which Debtor is entitled to turnover pursuant to 11 U.S.C. §§ 542[8] and 105[9]. (Complaint ¶¶ 32–36.)[10] Count III alleges that Defendant's Draw on the Acceptable Substitute LC for attorneys' fees and expenses subsequent to the Depository Account Closing Date constitutes a violation the Consent Order for which Defendant should be held in contempt. (*Id.* at ¶¶ 37–42.) Finally, Count IV alleges that Debtor is entitled to turnover of certain funds which have been deposited in Debtors' Depository Account, but for which deposits ("Missing Deposits") Debtors have not been credited.[11]

---

7. A copy of the Draft is included in Exhibit C to the Complaint.

8. Section 542 provides in pertinent part:
   (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

9. Section 105 provides in pertinent part:
   (a) The court may issue any order, process, or judgment that is necessary or appropri-ate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

10. 11 U.S.C. §§ 101 *et seq.* is hereinafter referred to as "§ ___".

11. Allegedly, $62,288.48 ("Liquidators' Funds") of the Missing Deposits were inadvertently deposited in the Depository Account and are funds that belong to Debtors' liquidators ("Liquidators"). The remaining $108,714.29 of Missing Deposits belongs to Debtors ("Debtors' Funds").

(*Id.* at ¶¶ 43–48.) Defendant now moves to dismiss all four counts of the Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[12]

## DISCUSSION

### I. Standard of Review Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6) serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). In deciding such a motion, the Court must accept as true all allegations contained in the complaint and construe all reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997); *Rogin v. Bensalem Township*, 616 F.2d 680, 685 (3d Cir.1980). The Federal Rules of Civil Procedure do not require a plaintiff to set out detailed facts to support its claims, but require only a short and plain statement of the claims which provides the defendant with fair notice of the nature thereof and the grounds upon which they rest. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957); *see also* Fed. R. Bankr.P. 7008[13]. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Therefore, the Court should not grant a Rule 12(b)(6) motion "unless is appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. In addition, Rule 12(b)(6) authorizes the Court to dismiss a claim on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

In determining whether a claim should be dismissed pursuant to Rule 12(b)(6), the Court may look only to the allegations contained in the Complaint and any exhibits attached thereto. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998). If matters outside the Complaint are presented to and not excluded by the Court, the motion to dismiss "shall be treated as one for summary judgment and disposed of as provided in [Fed. R.Civ.P.] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion". Fed.R.Civ.P. 12(b); *see also Pension Ben. Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993) ("The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond."). The decision to consider evidence outside the Complaint and convert a motion to dismiss to one for summary judgment is within the discretion

---

**12.** The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**13.** This rule makes Fed.R.Civ.P. 8(a) applicable in this proceeding. Fed.R.Civ.P. 8(a) provides in pertinent part:

"A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain... (2) a short and plain statement of the claim showing that the pleader is entitled to relief..."

of the Court. *Kulwicki v. Dawson,* 969 F.2d 1454, 1462 (3d Cir.1992).

■ Defendant argues that in determining whether dismissal is proper with respect to Count I, the Court "should bear in mind" certain arguments and objections made by Debtors and the Liquidators in response to Emergency Motions I and II prior to the time of the Draw. (Def.'s Mem. (Doc. # 7) at 8, n. 2., 8–9.) [14] I disagree. In my opinion, it would be premature to convert the instant motion to dismiss to a motion for summary judgment. Not only has Defendant not yet filed an answer to the Complaint, but also, the parties have conducted no discovery with respect to any of the allegations set forth therein. The only documents on file for the Court's consideration in ruling on the instant motion are the Complaint, the exhibits attached thereto (i.e., the Consent Order, Acceptable Substitute LC and Draft), Defendant's motion (Doc. # 7) to dismiss and the memoranda submitted in connection therewith. [15] In light of the limited nature of the current record in this proceeding, I will ignore any references to extraneous evidence and confine my ruling to the face of the Complaint.

## II. Counts I and III

■ In Counts I and III respectively, Debtor alleges that the Draw constitutes a breach of the Consent Order and an improper Draw on the Acceptable Substitute LC (Complaint ¶¶ 23–31); and that the Draw constitutes a violation of the Consent Order for which Defendant should be held in contempt of Court (*id.* at ¶¶ 37–42). Specifically, Debtor alleges that: (1) under the terms of the Consent Order, Defendant was permitted to debit the Depository Account during the period between the Petition Date and the Depository Account Closing Date for the "amount of any items deposited to the Depository Account and subsequently dishonored by the institutions by which they are payable or otherwise reversed and for its usual and customary fees, but not for attorneys' fees and expenses" (*id.* at ¶ 24); (2) subsequent to the Depository Account Closing Date, December 25, 1999, Defendant was not permitted to debit the Depository Account for any purpose (*id.* at ¶ 25); (3) the Draw was made by Defendant to reimburse itself for attorneys' fees and expenses incurred in the Action and in Debtors' chapter 11 cases, not to reimburse Defendant for items deposited to the Depository Account and subsequently dishonored by the institutions by which they were payable or for Defendant's usual and customary fees (*id.* at ¶ 26); (4) while under the terms of the Acceptable Substitute LC, Defendant was permitted to make a draw for "chargebacks" to any deposit accounts maintained by Debtors with Defendant ("Chargebacks") or because of the "absence of sufficient collected funds on deposit in any account(s) to make payment

14. Defendant contends that the Court should consider this extraneous evidence because: (1) the allegations set forth in the Complaint are inconsistent with certain arguments previously set forth by Debtors in opposing Emergency Motions I and II; and (2) *if* either of Debtor's or the Liquidators' positions, which were made prior to the time of the Draw, ultimately prevail, it will conclusively demonstrate "there were no funds on deposit in the Depository Account to pay any claim of any kind at the time [Defendant] drew under the Acceptable Substitute LC," thereby supporting Defendant's argument that its Certification was accurate and therefore, did not constitute a breach of the Consent Order or result in an improper Draw on the Acceptable Substitute LC. (Def.'s Mem. (Doc. # 7) at 8, n. 2.)

15. Defendant has submitted no documentation evidencing the extraneous arguments and objections of Debtor and the Liquidators which Defendant contends the Court should consider.

of checks, wire transfers, automated clearing house transfers, drafts and other debits thereto" ("Insufficient Funds"), the Draw was neither for Chargebacks or due to Insufficient Funds (Complaint ¶ 27); (5) to the extent Defendant sought reimbursement for attorneys' fees and expenses incurred between July 23, 1999 and the Depository Account Closing Date, under the terms of the Consent Order, Defendant was permitted to withhold only the actual amount of such fees and expenses plus $3,000.00, and was then required to file an application for the allowance of such fees and expenses no more than ten days after the Depository Account Closing Date, upon notice to Debtor and others (*id.* at ¶ 28); (6) Defendant did not file an application in this Court for the allowance of any attorneys' fees and expenses within the requisite time period, i.e., on or before January 10, 2000 (*id.* at ¶ 29); (7) Defendant's Draw breached the Consent Order, was an impermissible Draw under the terms of the Acceptable Substitute LC, and resulted in a reimbursement obligation on the part of Debtor to BankBoston, which obligation BankBoston has satisfied with collateral securing Debtor's reimbursement obligation (*id.* at ¶ 30); and (8) therefore, Defendant is liable to Debtor for breach of contract and for its improper Draw on the Acceptable Substitute LC in an amount to be determined at trial, but in no event less than the amount of the Drawn Funds, plus interest (*id.* at ¶ 31). In addition, Debtor further alleges that the Consent Order is a valid order of this Court, that Defendant negotiated and consented to the Consent Order and had knowledge of its provisions, and that by drawing on the Acceptable Substitute LC subsequent to the Depository Account Closing Date for attorneys' fees and expenses, Defendant thereby violated and disobeyed the Consent Order and should therefore be held in contempt thereof. (Complaint ¶¶ 37–42.) [16]

In response to these allegations, Defendant argues that Counts I and III should be dismissed because the allegations set forth in the Complaint demonstrate that there was no provision in the Consent Order that prohibited Defendant from drawing under the Acceptable Substitute LC when it did. (Def.'s Mem. (Doc. # 7) at 6.) Defendant asserts that while the Consent Order conditioned Debtor's right to continue to use the Depository Account after August 2, 1999 upon retaining an Acceptable Substitute LC, it was silent as to the circumstances under which Defendant would be permitted to Draw. (*Id.*) In addition, Defendant further argues that the Draw was also permissible under the terms of the Acceptable Substitute LC because its Certification complied with the requirements set forth therein. (*Id.* at 6–7.) Acknowledging that the Draw was made due to Insufficient Funds rather than for Chargebacks, Defendant contends that its Certification could have only been incorrect if: (1) the Draw had been made either for "items deposited to the Depository Account and subsequently dishonored by the institutions by which they were payable," or for Defendant's "usual and customary fees"; or (2) there had been at least $194,190.61 on deposit in the Depository Account at the time of the Draw. (*Id.* at 7.) In arguing that the first condition did not apply at the time of the Draw, Defendant asserts that: (1) the Draw was made for Debtor's "indemnification obligation" to Defendant, and did not result from the dishonor of any deposited items; and (2) the Draw was not for usual and

16. Debtor further seeks "an award of compensatory damages in an amount to be determined at trial, but no less than an amount equal to the Drawn Funds, plus interest, as well as its attorneys' fees incurred in this proceeding." (Complaint ¶ 42.)

customary fees, but for attorneys' fees and expenses, the payment of which, "according to [Debtor's] own interpretation of the Consent Order," Defendant could not obtain from the Depository Account at the time of the Draw. (*Id.*) In arguing that the second condition did not apply at the time of the Draw, Defendant asserts that while $241,735.79 was on deposit in the Depository Account at the time of the Draw, given Debtor's allegation in the Complaint that $67,288.48 belongs to Debtors' Liquidators, even if the Draw had been for a claim of the kind Defendant was authorized to pay from the Depository Account, there would have been insufficient funds therein to pay it. (Def.'s Mem. (Doc. # 7) at 8.) Finally, with respect to Count III, Defendant argues that, assuming *arguendo* that the facts as alleged in the Complaint demonstrate that the Draw constituted a breach of the Consent Order, Defendant cannot be held in contempt of court because Debtor cannot show by clear and convincing evidence, as it must, that Defendant's interpretation of the Consent Order was not reasonable and/or in good faith. (*Id.* at 11–14.)

Based on the facts alleged in the Complaint and all reasonable inferences drawn therefrom, considered in a light most favorable to Debtor, I find that Counts I and III sufficiently state claims, respectively, for breach of the Consent Order and improper Draw on the Acceptable Substitute LC, and contempt of court. The Consent Order was part of a contractual relationship between Debtor and Defendant and there is no doubt that Debtor has been adversely affected by Defendant's Draw on the Acceptable Substitute LC. Therefore, the question becomes whether the Consent Order and Acceptable Substitute LC together suggest that Defendant acted improperly as to Debtor in making the Draw and, if so, whether Defendant's conduct was the direct cause of any injury to Debt-

or. Upon reviewing the language of the Acceptable Substitute LC in the context of the Consent Order, I find that a question exists as to whether the Draft and Certification submitted by Defendant in support of the Draw fairly represented the facts. Given that questions remain as to whether the Draw was in accordance with the terms of both the Consent Order and the Acceptable Substitute LC, I find that Debtor is entitled to present evidence to support its claims for breach of contract and improper Draw on the Acceptable Substitute LC, as well as evidence in support of its claim for contempt.

The Consent Order provides that "[t]he term 'Acceptable Substitute LC' shall mean: an irrevocable standby letter of credit or an amendment to [the Existing LC] that... permits drawings on the same terms and conditions under which drawings are permitted under the Existing LC". (Consent Order ¶ 9.) It further provides that "[f]rom and after the Petition Date and until the Depository Account Closing Date, [Defendant] may debit the Depository Account for the amount of any items deposited to the Depository Account and subsequently dishonored by the institutions by which they are payable or otherwise reversed and for its usual and customary fees, but not for attorneys' fees and expenses" ("Debit Limitation"). (*Id.*) Although Defendant contends that the Certification cannot be challenged as inaccurate because the Draw was made due to "the absence of sufficient collected funds on deposit in any account(s) to make payment for... other debits" (Acceptable Substitute LC at 1), in my opinion the Debit Limitation can fairly be viewed as suggesting that the language in the Acceptable Substitute LC with respect to "other debits" is to be narrowly construed so that the Consent Order's prohibition on debiting the Depository Account for attor-

neys' fees and expenses limits Defendant's debiting rights under the Acceptable Substitute LC. As a result, I think a question exists as to whether the "other debits" language in the Acceptable Substitute LC was intended to encompass Defendant's charges for legal fees and expenses and/or the ambiguous "indemnification obligation" for which Defendant admits the Draw was made. Although Defendant's argument suggests that the Acceptable Substitute LC was intended to encompass such debits, this argument is premised on documents and contractual relationships that have not been identified by either party.

As discussed above, Defendant's argument that the Draw did not violate the terms of the Acceptable Substitute LC rests on Defendant's condition that the Certification was accurate in that: (1) the Draw was made for Debtor's "indemnification obligation" to Defendant for attorneys' fees and expenses, the payment of which Defendant could not obtain out of the Depository Account at the time of the Draw (Def.'s Mem. (Doc. # 7) at 7), and (2) even if the "indemnification obligation" was one Defendant was authorized to pay out of Depository Account, there were insufficient funds on deposit therein at the time of the Draw (*id.* at 8). With respect to the first prong of Defendant's argument, the Court has no idea as to what obligation Defendant's term "indemnification obligation" refers. The parties have failed to identify and explain what such "indemnification obligation" ("Indemnification Obligation") is, how it arose, and/or whether or not its terms are embodied in some form of document. It is possible that the Indemnification Obligation is that which is referred to in Defendant's statement that "[t]he amount of the draft represented fees and expenses incurred by the Maryland Banks in connection with [Debtor's] deposit accounts for which [Debtor] is obligated to indemnify the Maryland Banks pursu-

ant to the Rules and Regulations for Deposit Accounts that governed [Debtor's] depository relationship with the Maryland Banks" ("Rules and Regulations"). (*Id.* at 4.) However, even if this is true, the Court has no idea as to what Rules and Regulations this statement refers. Aside from the brief reference cited above, neither party has identified or made any reference to any Rules and/or Regulations which may govern the parties' depository relationship, nor have they addressed the issue of how such Rules and Regulations may pertain to the instant dispute. While Defendant's argument suggests that its permission under the terms of the Consent Order and the Acceptable Substitute LC to make the Draw when it did is somehow addressed by either the Indemnification Obligation or the Rules and Regulations giving rise thereto, in absence of any reference by the parties as to how Debtor's Indemnification Obligation and/or the Rules and Regulations relate to the "other debit" language contained in the Acceptable Substitute LC, I am unable to determine if these references fall within such language.

In addition, with respect to the second prong of Defendant's argument, Defendant supports its contention that there were insufficient funds on deposit in the Depository Account at the time of the Draw to pay Defendant's $194,190.61 claim by arguing that although there was $241,735.79 was on deposit in the Depository Account at the time of the Draw, Debtor has since alleged that $67,288.48 belongs to Debtors' Liquidators. However, I find Defendant's reliance on Debtor's allegation to be misplaced. First, Defendant's Certification was made at the time of the Draw, not subsequent to the filing of the Complaint. Therefore, any facts alleged in the Complaint of which Defendant was not aware at the time at which it made the Certifica-

tion are irrelevant for the purposes of determining the accuracy thereof. Second, Count IV alleges that the Missing Deposits, which include the $67,288.48 to which Defendant refers in its argument, have not yet been credited to the Depository Account. Assuming this is true, Defendant's argument that the $241,735.79 on deposit in the Depository Account was insufficient to cover Defendant's $194,190.61 claim because $67,288.48 belonged to the Liquidators fails.

Despite Defendant's contention to the contrary, I find that a question exists as to whether there were Insufficient Funds on deposit in the Depository Account at the time of the Draw. As Debtor points out in its memorandum, at that time, there had neither been a determination by this Court as to the proper ownership of the Liquidators' Funds, nor a concession by Debtors that such funds belonged to its Liquidators. Although Defendant argues that at the time Debtor's Liquidators "had taken the position that no funds on deposit with [Defendant] even belonged to [Debtor]" (Def.'s Reply (Doc. # 9) at 8), I find the Liquidators' position at the time to be irrelevant. The Certification stated that the Draw was due to "the absence of sufficient collected funds on deposit in any account(s) to make payment of . . . other debits". (Complaint ¶ 20.) If Defendant made this Certification without knowing it to be true, an argument can be made that the Certification was inaccurate. Indeed, such a conclusion may be supported by Defendant's own acknowledgment that "determining whether there were any collected funds on deposit in the Depository Account to pay any claim, let alone determining the amount of such funds if any existed, was impossible." (Def.'s Reply (Doc. # 9) at 8–9.)

In light of the foregoing, and of Defendant's failure to respond to Debtor's allegation that the Draw constituted a breach of the Consent Order and the Acceptable Substitute LC due to the fact that it was made subsequent to the Depository Account Closing Date in violation of the Consent Order, I find that Counts I and III sufficiently state claims, respectively, for breach of contract and improper Draw on the Acceptable Substitute LC, and contempt of Court. Defendant's additional argument that Count III must be dismissed because Debtor can not show by clear and convincing evidence that Defendant's interpretation of the Consent Order was not reasonable and/or in good faith is without merit. The issue at this stage of the proceeding is not whether Debtor can ultimately meet the burden of proof required with respect to its claim for contempt, but rather, whether the facts alleged in Count III sufficiently states a claim upon which relief may be granted. I find that it does.

### III.  Count II

In Count II, Debtor seeks turnover of the Drawn Funds as property of the Estate pursuant to §§ 542 and 105. (Complaint ¶¶ 32–36). Defendant disputes that the Drawn Funds constitute property of the Estate and argues that Count II should be dismissed as a matter of law because funds drawn on a letter of credit belong to the issuing bank and not to the customer causing the letter of credit to be issued. (Def.'s Mem. (Doc. # 7) at 10–11.) While Debtor does not dispute this general proposition to the extent such funds remain in the possession of the issuing bank, Debtor argues that the Drawn Funds constitute property of the Estate in the possession of Defendant for two reasons: (1) Debtor has an equitable interest in its claim to the return of the Drawn Funds as funds improperly debited from the Depository Account (Debtor's Mem. (Doc. # 8) ¶¶ 6–7); and (2) Debtor has an equitable interest in BankBoston's claim for breach of contract against Defendant arising out of Defendant's allegedly inaccurate Certifi-

cation under the Acceptable Substitute LC (*id.* at ¶¶ 6, 8).[17]

Based on the facts alleged in the Complaint and all inferences that can reasonably be drawn therefrom, considered in a light most favorable to Debtor, I find that Count II fails to state a claim upon which relief may be granted. In my opinion, Debtor can prove no set of facts in support of its claim that the Drawn Funds constitute property of the Estate such that Debtor would be entitled to turnover of the Drawn Funds pursuant to § 542. *See Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

■ As Defendant argues in its memorandum in support of its motion to dismiss, it is well settled that the proceeds from a letter of credit do not constitute property of the estate under § 541. *See, e.g., Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 589 (5th Cir.1987). Therefore, such proceeds, and in this case, the Drawn Funds, are not subject to turnover under § 542 as property that the Debtor "may use... under section 363." 11 U.S.C. §§ 363[18], 542 (2002). The fact that Debtor may have equitable interests in certain breach of contract claims which seek to recover the Drawn Funds, which interests constitute property of the estate, does not alter the result.[19]

■ "Turnover under 11 U.S.C. § 542 is a remedy available to debtors to obtain

17. This latter interest allegedly arises due to the facts that Debtor was obligated to reimburse BankBoston for the amount of the Drawn Funds, has already done so, and therefore, is equitably subrogated to any claim BankBoston has against Defendant for breach of the Acceptable Substitute LC. (Debtor's Mem. (Doc. # 8) ¶¶ 6, 8.)

18. Under § 363, the debtor or trustee may use, sell or lease property of the estate and, in some circumstances cash collateral. *See* 11 U.S.C. § 363(b)(1), (c)(1)-(2). For the purposes of § 363, " 'cash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest..." *Id.* at § 363(a).

19. In support of its argument to the contrary, Debtor cites *Demczyk v. Mut. Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823 (6th Cir.1997), a case in which the Sixth Circuit reversed a lower court's holding that proceeds from a standby letter of credit did not constitute property of a chapter 7 debtor's estate. *Id.* at 831. However, I find that case to be inapposite. First, the decision in *Graham Square* constituted a post-hearing decision on the merits. Here, the Court is faced with a motion to dismiss in which the only issue is whether the facts alleged in the Complaint can support an action for turnover pursuant to § 542. In addition, in contrast to the instant proceeding, the primary dispute in *Graham Square* did not involve a challenge to the defendant's draw on the letter of credit, but rather, a dispute as to the state law status of a loan commitment fee arising out of the underlying contract between the parties as buyer and seller, which fee had been paid out of the proceeds of the letter of credit. *See id.* at 828–31. Here however, Debtor's alleged interest in the Drawn Funds arises out of its contention that the Draw constituted both a breach of the Consent Order and an improper Draw under the terms of the Acceptable Substitute LC. Therefore, in contrast to *Graham Square* where the dispute arose out of the *underlying* contract, the instant dispute arises out of: (1) a contract that is inextricably tied to, and gave rise to the issuance of, the Acceptable Substitute LC (*see* Consent Order ¶ 9); and (2) the terms of the Acceptable Substitute LC itself. Thus, where the Court in *Graham Square* found that "[t]he characterization or status of the [amount in dispute] had passed from 'proceeds of the letter of credit' to 'commitment fee under the contract' " due to the fact that "the debtor's cause of action [was] based upon the underlying contract and not the letter of credit," *id.* at 831, here the status of the Drawn Funds has not "passed from" proceeds of the Acceptable Substitute LC and therefore, such Funds do not constitute property of the estate under § 541, *see, e.g., In re Compton*, 831 F.2d at 589.

what is acknowledged to be property of the bankruptcy estate." *In re Asousa P'ship.*, 264 B.R. 376, 384 (Bankr.E.D.Pa. 2001); *see also In re Rosenzweig*, 245 B.R. 836, 839–40 (Bankr.N.D.Ill.2000). It is not a remedy available to recover claimed debts which remain unliquidated and/or in dispute. *See, e.g., U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C.Cir.1991); *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir.1990); *Weiner's, Inc. v. T.G. & Y. Stores Co.*, 191 B.R. 30, 32 (S.D.N.Y.1996); *In re Asousa P'ship.*, 264 B.R. at 384 ("[Turnover under § 542] cannot be used to determine the rights of parties in legitimate contract disputes."); *In re N. Parent, Inc.*, 221 B.R. 609, 626 (Bankr.D.Mass. 1998). In the instant matter, it is clear from the facts alleged in the Complaint that Debtor's claim to the Drawn Funds remains both disputed and unliquidated. *See* discussion *supra*, Part I. Debtor is not seeking to recover property of the Estate, but rather, is seeking to recover property allegedly owed to the Estate as a result of Defendant's alleged breach of the Consent Order and Acceptable Substitute LC. The fact that Count I seeks to recover the Drawn Funds pursuant to a claim for breach of contract and improper Draw on the Acceptable Substitute LC supports this conclusion. So too does the fact that Debtor now argues that what constitute property of the Estate are its *equitable interests* in its claim to the return of the Drawn Funds. In effect, Count II is nothing more than an impermissible attempt to circumvent Count I and recover that to which Debtor has not yet established an undisputed, liquidated claim. While Count I constitutes a proper remedy at this stage of the proceeding, Count II does not. *See, e.g., Inslaw*, 932 F.2d at 1472; *In re Charter Co.*, 913 F.2d at 1579; *Weiner's, Inc.*, 191 B.R. at 32; *In re Asousa P'ship.*, 264 B.R. at 384; *In re Rosenzweig*, 245 B.R. at 839–40; *N. Parent, Inc.*, 221 B.R. at 626.

## IV. Count IV

In Count IV, Debtor alleges that in the ordinary course of business, between June 1998 and October 1999, $176,002.77 ("Missing Deposits") was deposited in Debtors' Depository Account, yet never credited thereto. (Complaint ¶ 44.) Of those Missing Deposits, Debtor alleges that $62,288.48 belong to Debtors' Liquidators and was inadvertently deposited into the Depository Account, and $108,714.29 belong to Debtors. (*Id.*) With respect to its own Funds, Debtor alleges that such Funds constitute property that Debtor can use under § 363, that they therefore, constitute property of the Estate under § 541 (*id.* at ¶ 45), and that such Funds are not of inconsequential value or benefit to Debtors' Estates (*id.* at ¶ 46). Because, to date, Defendant has failed to properly credit the Depository Account or remit an amount equal to the Missing Deposits to Debtor despite Debtor's request that Defendant do so (*id.* at ¶ 47), Debtor alleges that it is now entitled to a judgment, pursuant to §§ 542 and 105, directing Defendant to deliver and account for Debtors' Funds to Debtor, and the Liquidators' Funds to the Liquidators (Complaint ¶ 48).

In response to these allegations, Defendant argues that Debtor is not entitled to relief because: (1) Debtor has no substantive right to enforce with respect to the Liquidators' Funds and therefore, the Liquidators, not Debtor, represent the real parties-in-interest with respect to those Funds pursuant to Fed.R.Civ.P. 17(a) (Def.'s Mem (Doc. # 7) at 14–15); and (2) Debtors' Funds are not subject to turnover pursuant to § 542 as Funds Debtor can use under § 363 because the Court has entered orders placing an preliminary administrative hold ("Hold") on any funds on deposit in the Depository Account pending

final rulings on Emergency Motions I and II (*id.* at 15–16). Having set forth these arguments, Defendant contends that Count IV should be dismissed in its entirety or, in the alternative, Count IV should be dismissed to the extent it relates to turnover of the Liquidators' Funds, and any further proceeding with respect to the Debtors' Funds should be stayed pending this Court's final ruling on Emergency Motions I and II. (*Id.* at 17.)

Based on the facts alleged in the Complaint and all reasonable inferences drawn therefrom, considered in a light most favorable to Debtor, I find that Count IV states a colorable claim for relief at least to the extent Debtor seeks to have the Missing Deposits properly credited to the Depository Account. In contrast to Debtor's alleged interest in the Drawn Funds, *see* discussion *supra*, Part III, Debtor's interest in the Missing Deposits is both liquidated and undisputed. Indeed, Defendant does not dispute Debtor's interest in the Missing Deposits, but rather argues that the instant action for turnover is inappropriate and unnecessary in light of the Hold and the fact that Emergency Motions I and II remain pending. (Def.'s Mem. (Doc. # 7) at 15–16.) I disagree.

As Debtor notes in its memorandum (Doc. # 8) in opposition to Defendant's motion to dismiss, Defendant's argument that Debtor is not entitled to relief because the Depository Account is subject to the Hold misses the point. (Debtor's Mem. (Doc. # 8) ¶ 12.) The fact that the funds on deposit in the Depository Account are currently subject to the Hold has no bearing on the instant matter. Debtor alleges in the Complaint that the Missing Deposits were never credited to the Depository Account. (Complaint ¶ 44.) Accepting this to be true, an argument can be made that the Missing Deposits are not yet "on deposit in the Depository Account" such that

they are subject to the Hold. As such, the missing Deposits would constitute funds that Debtor can use within the meaning of § 542.

Similarly, I am not convinced by Defendant's argument that as a practical matter, Count IV is unnecessary because if the Court rules ultimately rules in favor of Debtor with respect to Emergency Motions I and II, "[Defendant] will release the funds remaining on deposit in the Depository Account to [Debtor] or the Liquidators, as the Court determines" (Def.'s Mem. (Doc. # 7) at 16, n. 4). As discussed above, assuming, as Debtor alleges in the Complaint, that the Missing Deposits have never been credited to the Depository Account (Complaint ¶ 44), Defendant's release of the funds "remaining on deposit in the Depository Account" upon a final ruling on Emergency Motions I and II would not resolve the instant dispute because the Missing Deposits are allegedly not included in such funds. Indeed, if Emergency Motions I and II are ultimately decided in Debtor's favor, Debtor will never receive the benefit of the Missing Deposits absent the relief sought in Count IVi.e., a judgment directing Defendant to "deliver and account" for the Missing Deposits pursuant to § 542. In light of the fact that the Hold remains in effect, such a judgment need not direct Defendant to actually turn over the Missing Deposits to Debtor, but may simply require that Defendant credit the Depository Account with the Missing Deposits. Indeed, the issue of whether Debtor is entitled to have the Depository Account *credited* with the Missing Deposits is separate and distinct from the issue of whether Debtor is ultimately entitled to the disposition of such Missing Deposits. Thus, while turnover may not be the proper recovery at this stage of the proceeding, Debtor has certainly stated a colorable

claim with respect to having the Depository Account properly credited.

■ In addition, I disagree with Defendant's contention that Debtor's right to recover the Liquidators' Funds is somehow different than its right to recover Debtors' Funds because Debtor is not a real party in interest with respect thereto. (*See* Def.'s Mem. (Doc. # 7) at 14–15). Rule 17(a) of the Federal Rules of Civil Procedure ("Rule 17(a)"), applicable in this proceeding pursuant to Fed. R. Bankr.P. 7017, provides that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). The real party in interest for the purposes of Rule 17(a) is "[t]he person holding the substantive right to be enforced." *T.A. Title Ins. Co. v. Lampl, Sable & Makoroff (In re Marcus Hook Dev. Park, Inc.)*, 153 B.R. 693, 700–01 (Bankr.W.D.Pa.1993). In the instant matter, I find that Debtor is the party with the substantive right to be enforced with respect to all Missing Deposits because Debtor is the party who allegedly made such Deposits, as well as the party who maintains the Account to which such Deposits allegedly were never properly credited. The fact that Debtor acknowledges that a portion of such Deposits belongs to its Liquidators does not alter Debtor's right to seek relief with respect thereto vis-a-vis Defendant. Indeed, the Liquidators' rights to recover the Liquidators' Funds from Debtor are independent from Debtor's right to have Defendant properly account for the Missing Deposits. Any cause of action the Liquidators' may have arising out of Debtor's potential misappropriation of the Liquidators' Funds stands

against Debtor, not Defendant.[20] Presumably, if the Liquidators are entitled to recover the Liquidators' Funds and such Funds are not paid out of the Missing Deposits,[21] Debtors will be forced to pay the Liquidators an equivalent amount from another source. Therefore, I find that, vis-a-vis Defendant, Debtor is the real party in interest with respect to all Missing Deposits and thus, Debtor may seek to recover the Liquidators' Funds to the same extent it may seek to recover its own Funds. *See* discussion, *supra* Part IV.

In light of the foregoing, I will permit Count IV to stand limited to Debtor's right to have the Missing Deposits properly credited to the Depository Account, reserving for determination at a later date the proper disposition of any Missing Deposits credited to such Account.

## CONCLUSION

For the reasons discussed above, Defendant's motion (Doc. # 7) to dismiss is granted with respect to Count II of the Complaint, but denied with respect to Counts I, III and IV.

---

**20.** The Court states no opinion as to whether the Liquidators have a viable cause of action against Debtor with respect to the Liquidators' Funds.

**21.** Indeed, one way Debtor may potentially "use" the Liquidators' Funds is to pay them to the Liquidators.